309 F.3d 629
 Marcus CONANT, Dr.; Donald Northfelt, Dr.; Debashish Tripathy, Dr.; Neil Flynn, Dr.; Stephen Follansbee, Dr.; Stephen O'Brien, Dr.; Milton Estes, Dr.; Jo Daly; Keith Vines; Judith Cushner; Valerie Corral; Bay Area Physicians for Human Rights; Being Alive: People with HIV/AIDS Action Coalition, Inc.; Howard Maccabee, Dr.; Daniel Kane; Allan Flach, Dr.; Michael Ferrucci, Plaintiffs-Appellees,
v.
John P. WALTERS,*, Director of the White House Office of National Drug Control Policy; Asa Hutchinson,** Administrator, U.S. DEA; John Ashcroft,*** Attorney General of the United States; Tommy G. Thompson,**** Secretary of the Department of Health and Human Services, Defendants-Appellants.
 No. 00-17222.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 8, 2002.
 Filed October 29, 2002.
 
 COPYRIGHT MATERIAL OMITTED Mark B. Stern, Department of Justice, Washington, DC, for the defendants-appellants.
 Graham A. Boyd, ACLU Drug Policy Litigation, New Haven, CT, Jonathan Weissglass, Altshuler, Berzon, Nussbaum, Rubin & Demain, San Francisco, CA, Daniel N. Abrahamson, Drug Policy Alliance, Oakland, CA, Ann Brick, ACLU Foundation of Northern California, San Francisco, CA, for the plaintiffs-appellees.
 Stephen C. Willey, Latham & Watkins, Menlo Park, CA, for amici American Public Health Association, et al.
 Julie M. Carpenter, Robert M. Portman, and Janis C. Kestenbaum, Jenner & Block, Washington, DC, for amici California Medical Association, et al.
 Appeal from the United States District Court for the Northern District of California; William H. Alsup, District Judge, Presiding. D.C. No. CV-97-00139-WHA.
 Before: SCHROEDER, Chief Judge, B. FLETCHER and KOZINSKI, Circuit Judges.
 SCHROEDER, Chief Judge.
 
 
 1
 This is an appeal from a permanent injunction entered to protect First Amendment rights. The order enjoins the federal government from either revoking a physician's license to prescribe controlled substances or conducting an investigation of a physician that might lead to such revocation, where the basis for the government's action is solely the physician's professional "recommendation" of the use of medical marijuana. The district court's order and accompanying opinion are at Conant v. McCaffrey, 2000 WL 1281174 (N.D.Cal. Sept.7, 2000). The history of the litigation demonstrates that the injunction is not intended to limit the government's ability to investigate doctors who aid and abet the actual distribution and possession of marijuana. 21 U.S.C. § 841(a). The government has not provided any empirical evidence to demonstrate that this injunction interferes with or threatens to interfere with any legitimate law enforcement activities. Nor is there any evidence that the similarly phrased preliminary injunction that preceded this injunction, Conant v. McCaffrey, 172 F.R.D. 681 (N.D.Cal.1997), which the government did not appeal, interfered with law enforcement. The district court, on the other hand, explained convincingly when it entered both the earlier preliminary injunction and this permanent injunction, how the government's professed enforcement policy threatens to interfere with expression protected by the First Amendment. We therefore affirm.
 
 I. The Federal Marijuana Policy
 
 2
 The federal government promulgated its policy in 1996 in response to initiatives passed in both Arizona and California decriminalizing the use of marijuana for limited medical purposes and immunizing physicians from prosecution under state law for the "recommendation or approval" of using marijuana for medical purposes. See Cal. Health & Safety Code § 11362.5. The federal policy declared that a doctor's "action of recommending or prescribing Schedule I controlled substances is not consistent with the `public interest' (as that phrase is used in the federal Controlled Substances Act)" and that such action would lead to revocation of the physician's registration to prescribe controlled substances.[1] The policy relies on the definition of "public interest" contained in 21 U.S.C. § 823(f), which provides:
 
 
 3
 In determining the public interest, the following factors shall be considered: (1) The recommendation of the appropriate State licensing board or professional disciplinary authority. (2) The applicant's experience in dispensing, or conducting research with respect to controlled substances. (3) The applicant's conviction record under Federal or State laws relating to the manufacture, distribution, or dispensing of controlled substances. (4) Compliance with applicable State, Federal, or local laws relating to controlled substances. (5) Such other conduct which may threaten the public health and safety.
 
 
 4
 The policy also said that the DOJ and the HHS would send a letter to practitioner associations and licensing boards informing those groups of the policy. The federal agencies sent a letter two months later to national, state, and local practitioner associations outlining the Administration's position ("Medical Leader Letter"). The Medical Leader Letter cautioned that physicians who "intentionally provide their patients with oral or written statements in order to enable them to obtain controlled substances in violation of federal law ... risk revocation of their DEA prescription authority."
 
 II. Litigation History
 
 5
 Plaintiffs are patients suffering from serious illnesses, physicians licensed to practice in California who treat patients with serious illnesses, a patient's organization, and a physician's organization. The patient organization is Being Alive: People with HIV/AIDS Action Coalition, Inc. The physician's organization is the Bay Area Physicians for Human Rights. Plaintiffs filed this action in early 1997 to enjoin enforcement of the government policy insofar as it threatened to punish physicians for communicating with their patients about the medical use of marijuana. The case was originally assigned to District Judge Fern Smith, who presided over the case for more than two years. After Judge Smith received the parties' briefs, she issued a temporary restraining order, certified a plaintiff class, denied the government's motion to dismiss, issued a preliminary injunction, awarded interim attorney's fees to plaintiffs, and set the briefing schedule for discovery.
 
 
 6
 Judge Smith entered the preliminary injunction on April 30, 1997. It provided that the government "may not take administrative action against physicians for recommending marijuana unless the government in good faith believes that it has substantial evidence" that the physician aided and abetted the purchase, cultivation, or possession of marijuana, 18 U.S.C. § 2, or engaged in a conspiracy to cultivate, distribute, or possess marijuana, 21 U.S.C. § 846. Id. at 700. Judge Smith specifically enjoined the "defendants, their agents, employees, assigns, and all persons acting in concert or participating with them, from threatening or prosecuting physicians, [or] revoking their licenses ... based upon conduct relating to medical marijuana that does not rise to the level of a criminal offense." Id. at 701. The preliminary injunction covered not only "recommendations," but also "non-criminal activity related to those recommendations, such as providing a copy of a patient's medical chart to that patient or testifying in court regarding a recommendation that a patient use marijuana to treat an illness." Id. at 701 n. 8.
 
 
 7
 The government did not appeal the preliminary injunction, and it remained in effect after the case was transferred more than two years later to Judge Alsup on August 19, 1999. Judge Alsup in turn granted a motion to modify the plaintiff class, held a hearing on motions for summary judgment, granted in part and denied in part the cross-motions for summary judgment, dissolved the preliminary injunction, and entered a permanent injunction. The class was modified to include only those patients suffering from specific symptoms related to certain illnesses and physicians who treat such patients. The permanent injunction appears to be functionally the same as the preliminary injunction that Judge Smith originally entered. It provides that the government is permanently enjoined from:
 
 
 8
 (i) revoking any physician class member's DEA registration merely because the doctor makes a recommendation for the use of medical marijuana based on a sincere medical judgment and (ii) from initiating any investigation solely on that ground. The injunction should apply whether or not the doctor anticipates that the patient will, in turn, use his or her recommendation to obtain marijuana in violation of federal law.
 
 
 9
 Conant, 2000 WL 1281174, at *16.
 
 
 10
 In explaining his reasons for entering the injunction, Judge Alsup pointed out that there was substantial agreement between the parties as to what doctors could and could not do under the federal law. Id. at *11. The government agreed with plaintiffs that revocation of a license was not authorized where a doctor merely discussed the pros and cons of marijuana use. Id. The court went on to observe that the plaintiffs agreed with the government that a doctor who actually prescribes or dispenses marijuana violates federal law. The fundamental disagreement between the parties concerned the extent to which the federal government could regulate doctor-patient communications without interfering with First Amendment interests. Id. This appeal followed.
 
 III. Discussion
 
 11
 It is important at the outset to observe that this case has been litigated independently of contemporaneous litigation concerning whether federal law exempts from prosecution the dispensing of marijuana in cases of medical necessity. The Supreme Court in that litigation eventually held that it does not, reversing this court. See United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001), rev'g United States v. Oakland Cannabis Buyers' Coop., 190 F.3d 1109 (9th Cir.1999). When the district court entered the permanent injunction in this case, it pointed out that it was doing so without regard to this Circuit's decision in the Oakland Cannabis litigation. Conant, 2000 WL 1281174, at *15 n. 7.
 
 
 12
 The dispute in the district court in this case focused on the government's policy of investigating doctors or initiating proceedings against doctors only because they "recommend" the use of marijuana. While the government urged that such recommendations lead to illegal use, the district court concluded that there are many legitimate responses to a recommendation of marijuana by a doctor to a patient. There are strong examples in the district court's opinion supporting the district court's conclusion. For example, the doctor could seek to place the patient in a federally approved, experimental marijuana-therapy program. Id. at *15. Alternatively, the patient upon receiving the recommendation could petition the government to change the law. Id. at *14. By chilling doctors' ability to recommend marijuana to a patient, the district court held that the prohibition compromises a patient's meaningful participation in public discourse. Id. The district court stated:
 
 
 13
 Petitioning Congress or federal agencies for redress of a grievance or a change in policy is a time-honored tradition. In the marketplace of ideas, few questions are more deserving of free-speech protection than whether regulations affecting health and welfare are sound public policy. In the debate, perhaps the status quo will (and should) endure. But patients and physicians are certainly entitled to urge their view. To hold that physicians are barred from communicating to patients sincere medical judgments would disable patients from understanding their own situations well enough to participate in the debate. As the government concedes, ... many patients depend upon discussions with their physicians as their primary or only source of sound medical information. Without open communication with their physicians, patients would fall silent and appear uninformed. The ability of patients to participate meaningfully in the public discourse would be compromised.
 
 
 14
 
 Id.
 
 
 
 15
 On appeal, the government first argues that the "recommendation" that the injunction may protect is analogous to a "prescription" of a controlled substance, which federal law clearly bars. We believe this characterizes the injunction as sweeping more broadly than it was intended or than as properly interpreted. If, in making the recommendation, the physician intends for the patient to use it as the means for obtaining marijuana, as a prescription is used as a means for a patient to obtain a controlled substance, then a physician would be guilty of aiding and abetting the violation of federal law. That, the injunction is intended to avoid. Indeed the predecessor preliminary injunction spelled out what the injunction did not bar; it did not enjoin the government from prosecuting physicians when government officials in good faith believe that they have "probable cause to charge under the federal aiding and abetting and/or conspiracy statutes." 172 F.R.D. at 701.
 
 
 16
 The plaintiffs themselves interpret the injunction narrowly, stating in their brief before this Court that, "the lower court fashioned an injunction with a clear line between protected medical speech and illegal conduct." They characterize the injunction as protecting "the dispensing of information," not the dispensing of controlled substances, and therefore assert that the injunction does not contravene or undermine federal law.
 
 
 17
 As Judge Smith noted in the preliminary injunction order, conviction of aiding and abetting requires proof that the defendant "associate[d] himself with the venture, that he participate[d] in it as something that he wishe[d] to bring about, that he [sought] by his actions to make it succeed." 172 F.R.D. at 700 (quoting Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 190, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (internal quotation marks and citation omitted)). This is an accurate statement of the law. We have explained that a conviction of aiding and abetting requires the government to prove four elements: "(1) that the accused had the specific intent to facilitate the commission of a crime by another, (2) that the accused had the requisite intent of the underlying substantive offense, (3) that the accused assisted or participated in the commission of the underlying substantive offense, and (4) that someone committed the underlying substantive offense." See United States v. Gaskins, 849 F.2d 454, 459 (9th Cir.1988). The district court also noted that conspiracy requires that a defendant make "an agreement to accomplish an illegal objective and [that he] knows of the illegal objective and intends to help accomplish it." 172 F.R.D. at 700-01 (citing United States v. Gil, 58 F.3d 1414, 1423 & n. 5 (9th Cir.1995)).
 
 
 18
 The government on appeal stresses that the permanent injunction applies "whether or not the doctor anticipates that the patient will, in turn, use his or her recommendation to obtain marijuana in violation of federal law," and suggests that the injunction thus protects criminal conduct. A doctor's anticipation of patient conduct, however, does not translate into aiding and abetting, or conspiracy. A doctor would aid and abet by acting with the specific intent to provide a patient with the means to acquire marijuana. See Gaskins, 849 F.2d at 459. Similarly, a conspiracy would require that a doctor have knowledge that a patient intends to acquire marijuana, agree to help the patient acquire marijuana, and intend to help the patient acquire marijuana. See Gil, 58 F.3d at 1423. Holding doctors responsible for whatever conduct the doctor could anticipate a patient might engage in after leaving the doctor's office is simply beyond the scope of either conspiracy or aiding and abetting.
 
 
 19
 The government also focuses on the injunction's bar against "investigating" on the basis of speech protected by the First Amendment and points to the broad discretion enjoyed by executive agencies in investigating suspected criminal misconduct. The government relies on language in the permanent injunction that differs from the exact language in the preliminary injunction. The permanent injunction order enjoins the government "from initiating any investigation solely on" the basis of "a recommendation for the use of medical marijuana based on a sincere medical judgment." Conant, 2000 WL 1281174, at *16. The preliminary injunction order provided that "the government may not take administrative action against physicians for recommending marijuana unless the government in good faith believes that it has substantial evidence of [conspiracy or aiding and abetting]." 172 F.R.D. at 701.
 
 
 20
 The government, however, has never argued that the two injunctive orders differ in any material way. Because we read the permanent injunction as enjoining essentially the 13 same conduct as the preliminary injunction, we interpret this portion of the permanent injunction to mean only that the government may not initiate an investigation of a physician solely on the basis of a recommendation of marijuana within a bona fide doctor-patient relationship, unless the government in good faith believes that it has substantial evidence of criminal conduct. Because a doctor's recommendation does not itself constitute illegal conduct, the portion of the injunction barring investigations solely on that basis does not interfere with the federal government's ability to enforce its laws.
 
 
 21
 The government policy does, however, strike at core First Amendment interests of doctors and patients. An integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients. That need has been recognized by the courts through the application of the common law doctor-patient privilege. See Fed.R.Evid. 501.
 
 
 22
 The doctor-patient privilege reflects "the imperative need for confidence and trust" inherent in the doctor-patient relationship and recognizes that "a physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment." Trammel v. United States, 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). The Supreme Court has recognized that physician speech is entitled to First Amendment protection because of the significance of the doctor-patient relationship. See Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 884, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality) (recognizing physician's First Amendment right not to speak); Rust v. Sullivan, 500 U.S. 173, 200, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (noting that regulations on physician speech may "impinge upon the doctor-patient relationship").
 
 
 23
 This Court has also recognized the core First Amendment values of the doctor-patient relationship. In Nat'l Ass'n for the Advancement of Psychoanalysis v. California Bd. of Psychology, 228 F.3d 1043 (9th Cir.2000), we recognized that communication that occurs during psychoanalysis is entitled to First Amendment protection. Id. at 1054. We upheld California's mental health licensing laws that determined when individuals qualified as mental health professionals against a First Amendment challenge. Id. at 1053-56. Finding the laws content-neutral, we noted that California did not attempt to "dictate the content of what is said in therapy" and did not prevent licensed therapists from utilizing particular "psycho-analytical methods." Id. at 1055-56.
 
 
 24
 Being a member of a regulated profession does not, as the government suggests, result in a surrender of First Amendment rights. See Thomas v. Collins, 323 U.S. 516, 531, 65 S.Ct. 315, 89 L.Ed. 430 (1945) ("the rights of free speech and a free press are not confined to any field of human interest"). To the contrary, professional speech may be entitled to "the strongest protection our Constitution has to offer." Florida Bar v. Went For It, Inc., 515 U.S. 618, 634, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). Even commercial speech by professionals is entitled to First Amendment protection. See Bates v. Arizona, 433 U.S. 350, 382-83, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Attorneys have rights to speak freely subject only to the government regulating with "narrow specificity." NAACP v. Button, 371 U.S. 415, 433, 438-39, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).
 
 
 25
 In its most recent pronouncement on regulating speech about controlled substances, Thompson v. Western States Medical Ctr., 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002), the Supreme Court found that provisions in the Food and Drug Modernization Act of 1997 that restricted physicians and pharmacists from advertising compounding drugs violated the First Amendment. Id. at 1500. The Court refused to make the "questionable assumption that doctors would prescribe unnecessary medications" and rejected the government's argument that "people would make bad decisions if given truthful information about compounded drugs." Id. at 1507. The federal government argues in this case that a doctor-patient discussion about marijuana might lead the patient to make a bad decision, essentially asking us to accept the same assumption rejected by the Court in Thompson. Id. We will not do so. Instead, we take note of the Supreme Court's admonition in Thompson: "If the First Amendment means anything, it means that regulating speech must be a last — not first — resort. Yet here it seems to have been the first strategy the Government thought to try." Id.
 
 
 26
 The government's policy in this case seeks to punish physicians on the basis of the content of doctor-patient communications. Only doctor-patient conversations that include discussions of the medical use of marijuana trigger the policy. Moreover, the policy does not merely prohibit the discussion of marijuana; it condemns expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient. Such condemnation of particular views is especially troubling in the First Amendment context. "When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." Rosenberger v. Rector, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Indeed, even content-based restrictions on speech are "presumptively invalid." R.A.V. v. St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).
 
 
 27
 The government's policy is materially similar to the limitation struck down in Legal Services Corp. v. Velazquez, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001), that prevented attorneys from "present[ing] all the reasonable and well-grounded arguments necessary for proper resolution of the case." 531 U.S. at 545, 121 S.Ct. 1043. In Velazquez, a government restriction prevented legal assistance organizations receiving federal funds from challenging existing welfare laws. Id. at 537-38, 121 S.Ct. 1043. Like the limitation in Velazquez, the government's policy here "alter[s] the traditional role" of medical professionals by "prohibit[ing] speech necessary to the proper functioning of those systems." Id. at 544, 121 S.Ct. 1043.
 
 
 28
 The government relies upon Rust and Casey to support its position in this case. Rust, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233; Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674. However, those cases did not uphold restrictions on speech itself. Rust upheld restrictions on federal funding for certain types of activity, including abortion counseling, referral, or advocacy. See Rust, 500 U.S. at 179-80, 111 S.Ct. 1759. In Casey, a plurality of the Court upheld Pennsylvania's requirement that physicians' advice to patients include information about the health risks associated with an abortion and that physicians provide information about alternatives to abortion. 505 U.S. at 883-84, 112 S.Ct. 2791. The plurality noted that physicians did not have to comply if they had a reasonable belief that the information would have a "severely adverse effect on the physical or mental health of the patient," and thus the statute did not "prevent the physician from exercising his or her medical judgment." Id. The government's policy in this case does precisely that.
 
 
 29
 The government seeks to justify its policy by claiming that a doctor's "recommendation" of marijuana may encourage illegal conduct by the patient, which is not unlike the argument made before, and rejected by, the Supreme Court in a recent First Amendment case. See Ashcroft v. Free Speech Coalition, 535 U.S. 234, 122 S.Ct. 1389, 1403, 152 L.Ed.2d 403 (2002). In Free Speech Coalition, the government defended the Child Pornography Prosecution Act of 1996 by arguing that, although virtual child pornography does not harm children in the production process, it threatens them in "other, less direct, ways." Id. at 1397. For example, the government argued pedophiles might use such virtual images to encourage children to participate in sexual activity. Id. The Supreme Court rejected such justifications, holding that the potential harms were too attenuated from the proscribed speech. "Without a significantly stronger, more direct connection, the Government may not prohibit speech on the ground that it may encourage ... illegal conduct." Id. at 1403. The government's argument in this case mirrors the argument rejected in Free Speech Coalition.
 
 
 30
 The government also relies on a case in which a district court refused to order an injunction against this federal drug policy. See Pearson v. McCaffrey, 139 F.Supp.2d 113, 125 (D.D.C.2001). The court did so, however, because the plaintiffs in that case did not factually support their claim that the policy chilled their speech. See id. at 120. In this case, the record is replete with examples of doctors who claim a right to explain the medical benefits of marijuana to patients and whose exercise of that right has been chilled by the threat of federal investigation. The government even stipulated in the district court that a "reasonable physician would have a genuine fear of losing his or her DEA registration to dispense controlled substances if that physician were to recommend marijuana to his or her patients."
 
 
 31
 To survive First Amendment scrutiny, the government's policy must have the requisite "narrow specificity." See Button, 371 U.S. at 433, 83 S.Ct. 328. Throughout this litigation, the government has been unable to articulate exactly what speech is proscribed, describing it only in terms of speech the patient believes to be a recommendation of marijuana. Thus, whether a doctor-patient discussion of medical marijuana constitutes a "recommendation" depends largely on the meaning the patient attributes to the doctor's words. This is not permissible under the First Amendment. See Thomas v. Collins, 323 U.S. 516, 535, 65 S.Ct. 315, 89 L.Ed. 430 (1945). In Thomas, the court struck down a state statute that failed to make a clear distinction between union membership, solicitation, and mere "discussion, laudation, [or] general advocacy." The distinction rested instead on the meaning the listeners attributed to spoken words. Id. The government's policy, like the statute in Thomas, leaves doctors and patients "no security for free discussion." Id. As Judge Smith appropriately noted in granting the preliminary injunction, "when faced with the fickle iterations of the government's policy, physicians have been forced to suppress speech that would not rise to the level of that which the government constitutionally may prohibit." 172 F.R.D. at 696.
 
 
 32
 Our decision is consistent with principles of federalism that have left states as the primary regulators of professional conduct. See Whalen v. Roe, 429 U.S. 589, 603 n. 30, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (recognizing states' broad police powers to regulate the administration of drugs by health professionals); Linder v. United States, 268 U.S. 5, 18, 45 S.Ct. 446, 69 L.Ed. 819 (1925) ("direct control of medical practice in the states is beyond the power of the federal government"). We must "show[] respect for the sovereign States that comprise our Federal Union. That respect imposes a duty on federal courts, whenever possible, to avoid or minimize conflict between federal and state law, particularly in situations in which the citizens of a State have chosen to serve as a laboratory in the trial of novel social and economic experiments without risk to the rest of the country." Oakland Cannabis, 532 U.S. at 501, 121 S.Ct. 1711 (Stevens, J., concurring) (internal quotation marks omitted).
 
 
 33
 For all of the foregoing reasons, we affirm the district court's order entering a permanent injunction.
 
 
 34
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 John P. Walters is substituted for his predecessor, Barry R. McCaffrey, as Director of the White House Office of National Drug Control Policy. Fed. R.App. P. 43(c)(2)
 
 
 **
 As a Hutchinson is substituted for his predecessor, Thomas A. Constantine, as Administrator of the U.S. DEA. Fed. R.App. P. 43(c)(2)
 
 
 ***
 John Ashcroft is substituted for his predecessor, Janet Reno, as Attorney General of the United States. Fed. R.App. P. 43(c)(2)
 
 
 ****
 Tommy G. Thompson is substituted for his predecessor, Donna E. Shalala, as Secretary of the Department of Health and Human Services. Fed. R.App. P. 43(c)(2)
 
 
 [1]
 The policy was entitled "The Administration's Response to the Passage of California Proposition 215 and Arizona Proposition 200" and was released on December 30, 1996, by Barry R. McCaffrey, the Director of the Office of National Drug Control Policy ("ONDCP") at the time. The Administration's Response was promulgated by an interagency working group that included the ONDCP; the Drug Enforcement Administration ("DEA"); the Department of Justice ("DOJ"); the Department of Health and Human Services ("HHS"); the Nuclear Regulatory Commission; and the Departments of Treasury, Defense, Transportation, and Education
 
 
 KOZINSKI, Circuit Judge, concurring:
 
 35
 I am pleased to join Chief Judge Schroeder's opinion. I write only to explain that for me the fulcrum of this dispute is not the First Amendment right of the doctors. That right certainly exists and its impairment justifies the district court's injunction for the reasons well explained by Chief Judge Schroeder. But the doctors' interest in giving advice about the medical use of marijuana is somewhat remote and impersonal; they will derive no direct benefit from giving this advice, other than the satisfaction of doing their jobs well. At the same time, the burden of the federal policy the district court enjoined falls directly and personally on the doctors: By speaking candidly to their patients about the potential benefits of medical marijuana, they risk losing their license to write prescriptions, which would prevent them from functioning as doctors. In other words, they may destroy their careers and lose their livelihoods.[1]
 
 
 36
 This disparity between benefits and burdens matters because it makes doctors peculiarly vulnerable to intimidation; with little to gain and much to lose, only the most foolish or committed of doctors will defy the federal government's policy and continue to give patients candid advice about the medical uses of marijuana.[2] Those immediately and directly affected by the federal government's policy are the patients, who will be denied information crucial to their well-being, and the State of California, whose policy of exempting certain patients from the sweep of its drug laws will be thwarted. In my view, it is the vindication of these latter interests — those of the patients and of the state — that primarily justifies the district court's highly unusual exercise of discretion in enjoining the federal defendants from even investigating possible violations of the federal criminal laws.
 
 
 37
 In 1996, the people of California, acting by direct initiative, adopted a narrow exemption from their laws prohibiting the cultivation, sale and use of marijuana. The exemption applies only to patients whose physicians recommend or prescribe the drug for medical purposes. To those unfamiliar with the issue, it may seem faddish or foolish for a doctor to recommend a drug that the federal government finds has "no currently accepted medical use in treatment in the United States," 21 U.S.C. § 812(b)(1)(B). But the record in this case, as well as the public record, reflect a legitimate and growing division of informed opinion on this issue. A surprising number of health care professionals and organizations have concluded that the use of marijuana may be appropriate for a small class of patients who do not respond well to, or do not tolerate, available prescription drugs.[3]
 
 
 38
 Following passage of the California initiative, the White House Office of National Drug Control Policy commissioned the National Institute of Medicine of the National Academy of Sciences (IOM) to review the scientific evidence of the therapeutic application of cannabis. See Inst. of Med., Marijuana and Medicine: Assessing the Science Base (Janet E. Joy et al. eds., 1999) [hereinafter IOM Report], available at http://www.nap.edu/books/0309071550/html. The year-long study included scientific workshops, analysis of relevant scientific literature and extensive consultation with biomedical and social scientists. Id. at 15. It resulted in a 250-plus-page report which concluded that "[s]cientific data indicate the potential therapeutic value of cannabinoid drugs, primarily THC, for pain relief, control of nausea and vomiting, and appetite stimulation," id. at 179.
 
 
 39
 The IOM Report found that marijuana can provide superior relief to patients who suffer these symptoms as a result of certain illnesses and disabilities, in particular metastic cancer, HIV/AIDS, multiple sclerosis (MS), spinal cord injuries and epilepsy, and those who suffer the same symptoms as side effects from the aggressive treatments for such conditions. See id. at 53, 142, 153-54, 157, 160. As a consequence, the IOM Report cautiously endorsed the medical use of marijuana. See id. at 179.[4]
 
 
 40
 At about the time the IOM study got underway, the British House of Lords — a body not known for its wild and crazy views — opened public hearings on the medical benefits and drawbacks of cannabis. Like the IOM, the Lords concluded that "cannabis almost certainly does have genuine medical applications, especially in treating the painful muscular spasms and other symptoms of MS and in the control of other forms of pain." Select Comm. on Sci. & Tech., House of Lords, Sess. 1997-98, Ninth Report, Cannabis: The Scientific and Medical Evidence: Report § 8.2 (Nov. 4, 1998), available at http://www. publications.parliament.uk/pa/ld199798/ldselect/ldsctech/151/15101.htm. The Lords recommended that the British government act immediately "to allow doctors to prescribe an appropriate preparation of cannabis, albeit as an unlicensed medicine." Id. § 8.6.
 
 
 41
 In June 2001, Canada promulgated its Marihuana Medical Access Regulations after an extensive study of the available evidence. See Marihuana Medical Access Regulations, SOR 2001-227 (June 14, 2001), available at http://laws.justice.gc. ca/en/C-38.8/SOR-2001-227/index.html. The new regulations allow certain persons to cultivate and possess marijuana for medical use, and authorize doctors to recommend and prescribe marijuana to patients who are suffering from severe pain, muscle spasms, anorexia, weight loss or nausea, and who have not found relief from conventional therapies. See Office of Cannabis Med. Access, Health Canada, Medical Access to Marijuana — How the Regulations Work, at http://www.hc-sc.gc.ca/hecs-sesc/ocma/bckdr_1-0601.htm (last visited Aug. 23, 2002).[5]
 
 
 42
 Numerous other studies and surveys support the use of medical marijuana in certain limited circumstances.[6] The federal government itself has conducted studies on the subject, and continues to fund and provide the marijuana for studies conducted by private researchers. See, e.g., Bill Workman, Pot Study in Spotlight: San Mateo County's Clinical Trial Is a First in U.S., S.F. Chron., July 25, 2001, at A13; see also University of California Center for Medicinal Cannabis Research, Research, at http://www.cmcr.ucsd.edu/geninfo/research.htm (last visited Aug. 23, 2002) (listing eleven studies, nine of which have received regulatory approval, that will use federally supplied marijuana). Finally, the medical histories of individuals who have received and continue to receive medical marijuana from the federal government (reproduced in the Appendix) provide compelling support for the view that medical marijuana can make the difference between a relatively normal life and a life marred by suffering.
 
 
 43
 No doubt based on this and similar evidence, seven states (Alaska, Arizona, Colorado, Maine, Nevada, Oregon and Washington) have followed California in enacting medical marijuana laws by voter initiative, see Alaska Stat. Ann. §§ 11.71.090, 17.37.010-.080; Ariz.Rev. Stat. § 13-3412.01; Colo. Const. art. XVIII, § 14; Me.Rev.Stat. Ann. tit. 22, § 2383-B5; Nev. Const. art. 4, § 38; Or. Rev.Stat. §§ 475.300-.346; Wash. Rev. Code §§ 69.51A.005-.902; one other state (Hawaii) has done so by legislative enactment, see Haw.Rev.Stat. §§ 329-121 to -128. The total number of states that have approved marijuana for medical purposes now stands at nine.
 
 
 44
 The evidence supporting the medical use of marijuana does not prove that it is, in fact, beneficial. There is also much evidence to the contrary, and the federal defendants may well be right that marijuana provides no additional benefit over approved prescription drugs, while carrying a wide variety of serious risks.[7] What matters, however, is that there is a genuine difference of expert opinion on the subject, with significant scientific and anecdotal evidence supporting both points of view. See (Medical) MarijuanaInfo.org, at http://www.marijuanainfo.org (last visited Aug. 27, 2002) (exhaustive catalog of information and expert opinion on both sides of the medical marijuana debate). For the great majority of us who do not suffer from debilitating pain, or who have not watched a loved one waste away as a result of AIDS-induced anorexia, see IOM Report at 154, it doesn't much matter who has the better of this debate. But for patients suffering from MS, cancer, AIDS or one of the other afflictions listed in the IOM report, and their loved ones, obtaining candid and reliable information about a possible avenue of relief is of vital importance.
 
 
 45
 It is well established that the right to hear — the right to receive information — is no less protected by the First Amendment than the right to speak. See, e.g., Bd. of Educ. v. Pico, 457 U.S. 853, 866-67, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982); Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 756-57, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); Kleindienst v. Mandel, 408 U.S. 753, 762-63, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). Indeed, the right to hear and the right to speak are flip sides of the same coin. As Justice Brennan put it pithily, "It would be a barren marketplace of ideas that had only sellers and no buyers." Lamont v. Postmaster General, 381 U.S. 301, 308, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (Brennan, J., concurring), quoted with approval in Pico, 457 U.S. at 867, 102 S.Ct. 2799. This does not mean, however, that the right to speak and the right to listen always carry the same weight when a court exercises its equitable discretion. In this case, for instance, it is perfectly clear that the harm to patients from being denied the right to receive candid medical advice is far greater than the harm to doctors from being unable to deliver such advice.[8] While denial of the right to speak is never trivial, the simple fact is that if the injunction were denied, the doctors would be able to continue practicing medicine and go on with their lives more or less as before. It is far different for patients who suffer from horrible disabilities, such as plaintiff Judith Cushner, a mother of two and the director of a preschool program, who has fought breast cancer since 1989, and who only found relief from the debilitating effects of chemotherapy by smoking cannabis to counteract nausea, retching and chronic mouth sores; plaintiff Keith Vines, an Assistant District Attorney, decorated Air Force officer and father, whose bout with AIDS had caused him to lose more than 40 pounds of lean body mass, which he was only able to recover by using cannabis to stimulate his appetite; and many others like them. Enforcement of the federal policy will cut such patients off from competent medical advice and leave them to decide on their own whether to use marijuana to alleviate excruciating pain, nausea, anorexia or similar symptoms. But word-of-mouth and the Internet are poor substitutes for a medical doctor; information obtained from chat rooms and tabloids cannot make up for the loss of individualized advice from a physician with many years of training and experience.
 
 
 46
 A few patients may be deterred by the lack of a doctor's recommendation from using marijuana for medical purposes, but I suspect it would be very few indeed, because the penalties under state law for possession of small amounts of the drug are trivial. See Cal. Health & Safety Code § 11357(b) (making small-quantity possession a misdemeanor carrying a maximum $100 fine). A far more likely consequence is that, in the absence of sound medical advice, many patients desperate for relief from debilitating pain or nausea would self-medicate, and wind up administering the wrong dose or frequency, or use the drug where a physician would advise against it. Whatever else the parties may disagree about, they agree that marijuana is a powerful and complex drug, the kind of drug patients should not use without careful professional supervision.[9] The unintended consequence of the federal government's policy — a policy no doubt adopted for laudable reasons — will be to dry up the only reliable source of advice and supervision critically ill patients have, and drive them to use this powerful and dangerous drug on their own.
 
 
 47
 Which points to the second important interest impaired by the federal government's policy: California's interest in legalizing the use of marijuana in certain limited circumstances, so that critically ill patients may use it if and only if it is medically advisable for them to do so. The state relies on the recommendation of a state-licensed physician to define the line between legal and illegal marijuana use. The federal government's policy deliberately undermines the state by incapacitating the mechanism the state has chosen for separating what is legal from what is illegal under state law. Normally, of course, this would not be a problem, because where state and federal law collide, federal law prevails. See Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 108, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992); cf. United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001). In the circumstances of this case, however, I believe the federal government's policy runs afoul of the "commandeering" doctrine announced by the Supreme Court in New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), and Printz v. United States, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).
 
 
 48
 New York and Printz stand for the proposition that "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." Printz, 521 U.S. at 935, 117 S.Ct. 2365. Applied to our situation, this means that, much as the federal government may prefer that California keep medical marijuana illegal,[10] it cannot force the state to do so. Yet, the effect of the federal government's policy is precisely that: By precluding doctors, on pain of losing their DEA registration, from making a recommendation that would legalize the patients' conduct under state law, the federal policy makes it impossible for the state to exempt the use of medical marijuana from the operation of its drug laws. In effect, the federal government is forcing the state to keep medical marijuana illegal. But preventing the state from repealing an existing law is no different from forcing it to pass a new one; in either case, the state is being forced to regulate conduct that it prefers to leave unregulated.
 
 
 49
 It is true that by removing state penalties for the use of marijuana, a doctor's recommendation may embolden patients to buy the drug, and others to sell it to them, in violation of federal law. But the doctors only help patients obtain the drug by removing state penalties for possession and sale; they do not purport to exempt patients or anyone else from federal law, nor could they. If the federal government could make it illegal under federal law to remove a state-law penalty, it could then accomplish exactly what the commandeering doctrine prohibits: The federal government could force the state to criminalize behavior it has chosen to make legal.[11] That patients may be more likely to violate federal law if the additional deterrent of state liability is removed may worry the federal government, but the proper response — according to New York and Printz — is to ratchet up the federal regulatory regime, not to commandeer that of the state.
 
 
 50
 Nor does the state have another mechanism available to distinguish lawful from unlawful conduct. The state law in question does not legalize use of marijuana by anyone who believes he has a medical need for it. Rather, state law is closely calibrated to exempt from regulation only patients who have consulted a physician. And the physician may only recommend marijuana when he has made an individualized and bona fide determination that the patient is within the small group that may benefit from its use. If medical doctors are unable or unwilling to make this determination because they fear losing their DEA registration, there is no one who can take their place. Nurses and paramedics aren't qualified to do it, which is why they don't have authority to write prescriptions in the first place. Lawyers, judges and police can't do it, except by asking the advice of physicians. State administrators can't do it. If doctors are taken out of the picture — as the federal policy clearly aims to do — the state's effort to withdraw its criminal sanctions from marijuana use by the small group of patients who could benefit from such use is bound to be frustrated. The federal government's attempt to target doctors — eliminating the only viable mechanism for distinguishing between legal and illegal drug use — is a backdoor attempt to "control or influence the manner in which States regulate private parties." Reno v. Condon, 528 U.S. 141, 150, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000) (internal quotation marks omitted).
 
 
 51
 This is not a situation like United States v. Moore, 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975), where a doctor used his prescriptions license to circumvent the federal drug laws. Moore conducted inadequate or no medical examinations, ignored the results of the few tests he did perform, prescribed however many tablets the "patient" asked for and graduated his fee according to the number he prescribed. See id. at 142-43, 120 S.Ct. 666. The Court concluded that Moore had abandoned his professional role and effectively become a drug dealer. Here, by contrast, doctors are performing their normal function as doctors and, in so doing, are determining who is exempt from punishment under state law. If a doctor abuses this privilege by recommending marijuana without examining the patient, without conducting tests, without considering the patient's medical history or without otherwise following standard medical procedures, he will run afoul of state as well as federal law. But doctors who recommend medical marijuana to patients after complying with accepted medical procedures are not acting as drug dealers; they are acting in their professional role in conformity with the standards of the state where they are licensed to practice medicine. The doctor-patient relationship is an area that falls squarely within the states' traditional police powers. The federal government may not force the states to regulate that relationship to advance federal policy.
 
 
 52
 The commandeering problem becomes even more acute where Congress legislates at the periphery of its powers. The Constitution authorizes Congress to regulate activities that affect interstate commerce. But that authority is not boundless. As the Supreme Court recently reminded us, Congress must exercise its power so as to preserve "the Constitution's distinction between national and local authority." United States v. Morrison, 529 U.S. 598, 615, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). That distinction, in turn, was designed "so that the people's rights would be secured by the division of power." Id. at 616 n. 7, 120 S.Ct. 1740; see also U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 838, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Kennedy, J., concurring) ("The Framers split the atom of sovereignty. It was the genius of their idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other."). The Supreme Court's recent Commerce Clause jurisprudence is cut from the same cloth as the commandeering principle; both protect the duality of our unique system of government. The Commerce Clause limits the scope of national power, while the commandeering doctrine limits how Congress may use the power it has. These checks work in tandem to ensure that the federal government legislates in areas of truly national concern, while the states retain independent power to regulate areas better suited to local governance.
 
 
 53
 Medical marijuana, when grown locally for personal consumption, does not have any direct or obvious effect on interstate commerce. Cf. Oakland Cannabis Buyers' Coop., 532 U.S. at 495 n. 7, 121 S.Ct. 1711 (reserving "whether the Controlled Substances Act exceeds Congress' power under the Commerce Clause"). Federal efforts to regulate it considerably blur the distinction between what is national and what is local. But allowing the federal government, already nearing the outer limits of its power, to act through unwilling state officials would "obliterate the distinction" entirely. United States v. Lopez, 514 U.S. 549, 557, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (internal quotation marks omitted).[12]
 
 
 54
 It may well be, as our opinion holds, that interference with the rights of doctors to speak is sufficient to support the district court's injunction. Nevertheless, it remains a significant step for a court to enjoin the prosecution and even investigation of what federal officials believe may be a violation of federal law. See, e.g., Bresgal v. Brock, 843 F.2d 1163, 1171 (9th Cir.1987); Jett v. Castaneda, 578 F.2d 842, 845 (9th Cir.1978). In affirming the district court, I therefore find comfort in knowing that the interests of the patients, and those of the state, provide significant additional support for the district court's exercise of discretion.
 
 Appendix
 
 55
 From 1978 to 1992, the federal government conducted its own medical marijuana program. Today, the government continues to supply individuals who participated in this program with marijuana under its Compassionate Care program; they are among the few people in the country who can use the drug legally. Together with the American Public Health Association and other health care and medical organizations, individuals in this group filed an amicus brief supporting the plaintiffs. The following are their personal statements, taken from that brief.
 
 
 56
 Barbara M. Douglass was diagnosed with Multiple Sclerosis in 1988 at the age of 22. In 1991, Ms. Douglass began receiving herbal cannabis from the United States government upon the advice and assistance of her physician. Prior to this date, Ms. Douglass had never tried cannabis. Each month, the government provides her physician with one can containing three hundred cannabis cigarettes, each weighing 7/10 oz. Ms. Douglass and her physician report that herbal cannabis provides relief from pain and spasms and stimulates her appetite to counteract the effects of wasting syndrome from which she suffered prior to using cannabis. Ms. Douglass has never experienced any adverse side effects from marijuana. Without cannabis, Ms. Douglass believes she would not be alive today.
 
 
 57
 George Lee McMahon was born July 22, 1950, with Nail Patella Syndrome, a rare genetic disorder that causes severe pain, nausea and muscle spasms. Mr. McMahon tried conventional medications to treat his symptoms, but found the side effects of these medications to be intolerable. In the early 1980s, Mr. McMahon discovered that herbal cannabis alleviated his pain, nausea and spasms, stimulated his appetite and allowed him to sleep through the night. In 1988, Mr. McMahon informed his physician that he was successfully self-medicating with cannabis. His physician ordered him to cease his cannabis use and return to prescription medications. Over the following six months, Mr. McMahon's health progressively degenerated. Mr. McMahon's physician then helped Mr. McMahon apply to the federal government's Compassionate Care IND Program. In March 1990, Mr. McMahon was accepted into the program and for the past decade has received 300 cannabis cigarettes each month from the United States government. Mr. McMahon and his physician believe that without cannabis Mr. McMahon would not be alive today.
 
 
 58
 Elvy Musikka was diagnosed with glaucoma in 1975 at the age of 36. She tried conventional medications to treat her condition, but could not tolerate them. Reluctantly, in 1976, she decided to try herbal cannabis at the advice of her physician. The cannabis provided her immediate relief, substantially lowering her intraocular pressure as no other medication had, with few side effects. Ms. Musikka ingests cannabis by smoking it, as well as eating it in baked goods and olive oil. Fearful of the legal consequences of smoking cannabis, Ms. Musikka underwent several risky surgeries in an attempt to correct her condition, but they were unsuccessful and left her blind in one eye. In 1988, Ms. Musikka was arrested in Florida and charged with cannabis possession. She challenged her conviction in the Florida Supreme Court, where she prevailed, becoming the first person in that state to establish a medical necessity defense for cannabis. Shortly thereafter, the federal government enrolled Ms. Musikka in its medical cannabis program and has provided her with one and one-half pounds of herbal cannabis on a quarterly basis ever since. Ms. Musikka and her physician believe that if she were deprived of cannabis she would go blind.
 
 
 59
 Irvin Henry Rosenfeld was diagnosed at age 10 with multiple congenital cartilaginous exostosis, a disease causing the continuous growth of bone tumors, and the generation of new tumors, on ends of most of the long bones in his body. He was told he would not survive into adulthood. In an attempt to treat the painful symptoms of this disease, he was prescribed high doses of opioid analgesics, muscle relaxants and anti-inflammatory medications, which he took on a daily basis, but which had minimal efficacy and produced debilitating side effects. In 1971, Mr. Rosenfeld began using smoked herbal cannabis with the approval and under the supervision of a team of physicians. Mr. Rosenfeld found the cannabis highly efficacious in alleviating pain, reducing swelling, relaxing muscles and veins that surround the bone tumors, and preventing hemorrhaging. In 1982, the United States government, operating under the Compassionate Care IND Program, at the request of his physicians, began supplying Mr. Rosenfeld with herbal cannabis to treat his condition. For the past 19 years, the government has consistently provided him with a 75-day supply of herbal cannabis, totaling 33 ounces per shipment. Mr. Rosenfeld smokes 12 marijuana cigarettes a day to control the symptoms of his disease. In the 30 years that Mr. Rosenfeld has used herbal cannabis as a medicine, he has experienced no adverse side effects (including no "high"), has been able to discontinue his prescription medications, and has worked successfully for the past 13 years as a stockbroker handling multi-million dollar accounts. Mr. Rosenfeld and his physicians believe that but for herbal cannabis, Mr. Rosenfeld might not be alive, or, at the very least, would be bed-ridden.
 
 
 
 Notes:
 
 
 [1]
 Dr. Neil M. Flynn, Professor at the University of California at Davis School of Medicine, offers one perspective:
 AIDS medicine is my profession and my passion. I have dedicated myself to this disease since 1983 when I opened the Clinic at U.C. Davis. Thus, I am deeply concerned about civil and criminal sanctions that loom over me .... If I lost my Schedule II license, my ability to provide care for people with AIDS — 80% of my patients — would be severely compromised. I write 30-50 narcotic prescriptions per month for my seriously ill patients. I would no longer be able to do so if my DEA license were revoked.
 
 
 [2]
 As Alice Pasetta Mead explained in her expert report:
 [P]hysicians are particularly easily deterred by the threat of governmental investigation and/or sanction from engaging in conduct that is entirely lawful and medically appropriate.... [A] physician's practice is particularly dependent upon the physician's maintaining a reputation of unimpeachable integrity. A physician's career can be effectively destroyed merely by the fact that a governmental body has investigated his or her practice....
 The federal government's policy had precisely this effect before it was enjoined by the district court. Dr. Milton N. Estes, Associate Clinical Professor in the Department of Obstetrics, Gynecology and Reproductive Medicine at the University of California-San Francisco (UCSF), reports:
 As a result of the government's public threats, I do not feel comfortable even discussing the subject of medical marijuana with my patients. I feel vulnerable to federal sanctions that could strip me of my license to prescribe the treatments my patients depend upon, or even land me behind bars.... Because of these fears, the discourse about medical marijuana has all but ceased at my medical office.... My patients bear the brunt of this loss in communication.
 And Dr. Stephen O'Brien, former co-director of UCSF HIV Managed Care, similarly notes:
 Due to fear caused by these threats, I feel compelled and coerced to withhold information, recommendations, and advice to patients regarding use of medical marijuana.... I am fearful and reluctant to engage in even limited communications regarding medical marijuana.
 
 
 [3]
 I am indebted to the brief of amici American Public Health Association et al. for its lucid and forceful analysis of this issue. Much of the discussion in the text is plagiarized from that brief. For case of readability, I dispense with further attribution
 
 
 [4]
 The IOM Report concluded:
 Short-term use of smoked marijuana (less than six months) for patients with debilitating symptoms (such as intractable pain or vomiting) must meet the following conditions: failure of all approved medications to provide relief has been documented, the symptoms can reasonably be expected to be relieved by rapid-onset cannabinoid drugs, such treatment is administered under medical supervision in a manner that allows for assessment of treatment effectiveness, and [the treatment] involves an oversight strategy comparable to an institutional review board process that could provide guidance within 24 hours of a submission by a physician to provide marijuana to a patient for a specified use.
 Id. at 179.
 The IOM limited its recommendation to six months primarily because of health concerns about damage from smoking the drug for a prolonged period of time. See id. at 126, 179. This concern may be less alarming to patients suffering critical or terminal illnesses. As Dr. Debasish Tripathy, Assistant Clinical Professor of Medicine at UCSF, explains, "Any discussion of adverse consequences appears to focus on the effects of long-term use (e.g., adverse effects on the lungs), and even those concerns are speculative.... In populations with short life expectancies, the risks become less imminent and the benefits more paramount." See also Jerome P. Kassirer, M.D., Editorial, Federal Foolishness and Marijuana, New Eng. J. Med., Jan. 30, 1997, at 366, 366 ("Marijuana may have long-term adverse effects and its use may presage serious addictions, but neither long-term side effects nor addiction is a relevant issue in such patients.").
 
 
 [5]
 In 1988, an Administrative Law Judge of the Drug Enforcement Administration similarly concluded that certain patients should have access to medical marijuanaSee In re Marijuana Rescheduling Petition, No. 86-22 (Drug Enforcement Admin. Sept. 6, 1988). ALJ Young found:
 The evidence in this record clearly shows that marijuana has been accepted as capable of relieving the distress of great numbers of very ill people, and doing so with safety under medical supervision. It would be unreasonable, arbitrary and capricious for DEA to continue to stand between those sufferers and the benefits of this substance in light of the evidence in this record.
 Id. at 68. The DEA Administrator did not endorse the ALJ's findings. See 54 Fed.Reg. 53,767 (Dec. 29, 1989).
 
 
 [6]
 See, e.g., Clive Cookson, High Hopes for Cannabis To Relieve Pain, Fin. Times, Sept. 4, 2001, National News, at 4 ("Cannabis extract is proving remarkably effective at relieving severe pain in patients with multiple sclerosis and spinal injury...."); David Baker et al., Cannabinoids Control Spasticity and Tremor in a Multiple Sclerosis Model, 404 Nature 84 (2000) (finding therapeutic potential in the use of cannabis to control the debilitating symptoms of MS); William J. Martin, Basic Mechanisms of Cannabinoid-Induced Analgesia, Int'l Ass'n for the Study of Pain Newsletter, Summer 1999, available at http://www.halcyon.com/iasp/TC99Summer.html (noting that cannabinoids can reduce pain); Richard E. Doblin & Mark A.R. Kleiman, Marijuana as Antiemetic Medicine: A Survey of Oncologists' Experiences and Attitudes, 9 J. Clinical Oncology 1314 (1991) (reporting that a majority of oncologists surveyed thought marijuana should be available by prescription); H.M. Meinck et al., Effect of Cannabinoids on Spasticity and Ataxia in Multiple Sclerosis, 236 J. Neurology 120 (1989) (concluding from a neurological study that herbal cannabis provided relief from both muscle spasms and ataxia, a combined benefit not found in other available medications); Vincent Vinciguerra et al., Inhalation Marijuana as an Antiemetic for Cancer Chemotherapy, 88 N.Y. St. J. Med. 525 (1988) (finding that 78% of patients who were unresponsive to standard antiemetics responded positively to cannabis).
 
 
 [7]
 See 66 Fed.Reg. 20,038 (Apr. 18, 2001) (citing sources).
 
 
 [8]
 Dr. Stephen Eliot Follansbee, Chief of Staff at Davies Medical Center, noted the importance of this information to patients:
 Patients who seek my advice regarding the benefits of medical marijuana are evidence that there is hope. They have a very strong desire to survive their illness and to function as normally and productively as possible.... These patients ask me about marijuana not because they want to get high, but because they are fighting for their lives, which includes an honest search for the best available means to do so. Government threats against the physicians who struggle with these patients will inevitably thwart the patients' efforts. They may, in fact, remove their doctors from the healing process when vulnerable individuals are most in need of their counsel. Denying information and treatment advice to a seriously ill patient, when that medicine could promote and facilitate critical medical treatment, may needlessly hasten the patient's death.
 
 
 [9]
 Patients who use marijuana for medical purposes must strike a delicate balance; they must take enough of the drug so that they get needed relief from pain or other symptoms, but not so much as to induce the drug's well-known hallucinogenic side-effects, which interfere with daily life activities. Valerie A. Corral, who suffered from severe seizures before using medical marijuana, explains that she only needs "a few puffs of marijuana" to find relief that over fifteen pills a day could not provide. Judith Cushner recalls that smoking small amounts of marijuana as part of her cancer treatment was neither "a regular part of [her] day, nor did it become a habit." She states: "I smoked it only when nausea or retching commenced or worsened, usually in conjunction with a treatment session. There were weeks when I smoked it every few days. There were also periods when I didn't smoke for weeks at a time. Each time I felt a wave of nausea coming on, I inhaled just two or three puffs and it subsided." Similarly, Assistant District Attorney Keith Vines, countering AIDS-induced wasting syndrome, found that "it took only two or three puffs from a marijuana cigarette for my appetite to return .... Because I only required a small dose to stimulate my appetite, I did not need to get stoned in order to eat." Patients lacking the benefit of medical guidance may well take more than appropriate to alleviate their symptoms, unnecessarily suffering the drug's powerful side-effects
 
 
 [10]
 Following the passage of California's medical marijuana initiative, federal officials expressed concern that the measure would seriously affect the federal government's drug enforcement effort. They explained that federal drug policies rely heavily on the states' enforcement of their own drug laws to achieve federal objectives. In hearings before the Senate Judiciary Committee, DEA Administrator Thomas A. Constantine stated:
 I have always felt ... that the federalization of crime is very difficult to carry out; that crime, just in essence, is for the most part a local problem and addressed very well locally, in my experience. We now have a situation where local law enforcement is unsure .... The numbers of investigations that you would talk about that might be presently being conducted by the [Arizona state police] at the gram level or the milligram level would be beyond our capacity to conduct those types of individual investigations without abandoning the major organized crime investigations.
 Prescription for Addiction? The Arizona and California Medical Drug Use Initiatives: Hearing Before the S. Comm. on the Judiciary, 104th Cong. 42-43, 45 (1996) [hereinafter Judiciary Hearing] (statement of Thomas A. Constantine); see also Tim Golden, Doctors Are Focus of Plan To Fight New Drug Laws: Officials Deal with Narcotics' Medical Use, N.Y. Times, Dec. 23, 1996, at A10 ("Federal agents and prosecutors in fact pursue only a small fraction of the country's drug cases. In most districts, officials said, United States Attorneys bring Federal charges only if a marijuana case involves the cultivation of at least 500 plants grown indoors, 1,000 plants grown outdoors, or the possession of more than 1,000 pounds.").
 
 
 [11]
 Federal defendants concede that this is their goal, arguing that the doctors' actions are illegal because "[w]ithout [the doctors'] clinical recommendation or approval, patients and their primary caregivers are unable to invoke [Proposition 215's] protections from criminal prosecution or sanctionunder state law." Appellants' Reply Br. at 6 (internal quotation marks omitted) (emphasis added). General Barry McCaffrey, Director of the Office of National Drug Control Policy, made the same point: "Federal law is not at stake; the actions of local law enforcement are." Judiciary Hearing, supra, at 40.
 
 
 [12]
 The reluctance of state officials to enforce federal drug policies against medical marijuana patients is not merely theoreticalSee William Booth, Santa Cruz Defies U.S. on Marijuana: City Officials Vow To Defend Medical Uses, Wash. Post, Sept. 18, 2002, at A3. It is precisely such conflicts between state and federal officials that the commandeering doctrine is designed in part to prevent.