**PRECEDENTIAL**
**AMENDED**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 14-4546, 14-4568, and 14-4569
_____

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
an unincorporated association; NATIONAL BASKETBALL
ASSOCIATION, a joint venture; NATIONAL FOOTBALL
LEAGUE, an unincorporated association; NATIONAL
HOCKEY LEAGUE, an unincorporated association; OFFICE
OF THE COMMISSIONER OF BASEBALL, an
unincorporated association doing business as MAJOR
LEAGUE BASEBALL

v.

GOVERNOR OF THE STATE OF NEW JERSEY; DAVID
L. REBUCK, Director of the New Jersey Division of Gaming
Enforcement and Assistant Attorney General of the State of
New Jersey; FRANK ZANZUCCKI, Executive Director of
the New Jersey Racing Commission; NEW JERSEY
THOROUGHBRED HORSEMEN'S ASSOCIATION, INC;
NEW JERSEY SPORTS & EXPOSITION AUTHORITY

STEPHEN M. SWEENEY, President of the New Jersey
Senate; VINCENT PRIETO, Speaker of the New Jersey
General Assembly (Intervenors in District Court)

Appellants in 14-4568


Governor of New Jersey; David L. Rebuck; Frank Zanzuccki,
Appellants in 14-4546


New Jersey Thoroughbred Horsemen's Association, Inc.,
Appellant in 14-4569

_____

On Appeal from the United States District Court
for the District of New Jersey
(District Court No.: 3-14-cv-06450)
District Judge: Honorable Michael A. Shipp

_____


Argued on March 17, 2015 before Merits Panel
Court Ordered Rehearing En Banc on October 14, 2015
Argued En Banc on February 17, 2016


Before: AMBRO, FUENTES, SMITH, FISHER, JORDAN,
HARDIMAN, GREENAWAY JR., VANASKIE, KRAUSE,
RESTREPO, RENDELL, and BARRY, Circuit Judges

(Opinion filed: August 9, 2016)
(Amended: August 11, 2016)

John J. Hoffman, Esquire
Acting Attorney General of the State of New Jersey
Jeffrey S. Jacobson, Esquire
Stuart M. Feinblatt, Esquire
Peter M. Slocum, Esquire
Office of Attorney General of New Jersey
25 Market Street
Trenton, NJ   08625

Matthew M. Hoffman, Esquire
Gibson Dunn
333 South Grand Avenue
Los Angeles, CA   90071

Ashley E. Johnson, Esquire
Gibson Dunn
2100 McKinney Avenue
Suite 1100
Dallas, TX   75201

Theodore B. Olson, Esquire **(ARGUED)**
Matthew D. McGill, Esquire
Gibson Dunn
1050 Connecticut Avenue, N.W.
9th Floor
Washington, DC   20036

Counsel for Appellants Governor of the State of New Jersey, David L. Rebuck, and Frank Zanzuccki

Elliott M. Berman, Esquire
McElroy, Deutsch, Mulvaney & Carpenter
100 Mulberry Street
Three Gateway Center
Newark, NJ   07102

Ronald J. Riccio, Esquire **(ARGUED)**
Edward A. Hartnett, Esquire
McElroy, Deutsch, Mulvaney & Carpenter
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ   07962

Counsel for Appellant New Jersey Thoroughbred Horsemen's Association

Michael R. Griffinger, Esquire
Thomas R. Valen, Esquire
Jennifer A. Hradil, Esquire
Gibbons P.C.
One Gateway Center
Newark, New Jersey   07102

Counsel for Appellants Stephen M. Sweeney and Vincent Prieto

Paul D. Clement, Esquire **(ARGUED)**
Erin Murphy, Esquire
Bancroft PLLC
1919 M Street, N.W.
Suite 470
Washington, DC   20036

Jeffrey A. Mishkin, Esquire
Anthony J. Dreyer, Esquire
Skadden, Arps, Slate, Meagher, & Flom
4 Times Square
New York, NY   10036

William J. O'Shaughnessy, Esquire
Richard Hernandez, Esquire
McCarter & English
100 Mulberry Street
Four Gateway Center, 14th Floor
Newark, NJ   07102

       Counsel for Appellees National Collegiate
       Athletic Association; National Basketball
       Association; National Football League;
       National Hockey League; Office of the
       Commissioner of Baseball

Joyce R. Branda, Esquire
Acting Assistant Attorney General, Civil Division
Paul J. Fishman, Esquire **(ARGUED)**
United States Attorney of the District of New Jersey
Scott R. McIntosh, Esquire
Peter J. Phipps, Esquire
Attorneys, Civil Division
U.S. Department of Justice
P.O. Box 883
Washington, DC   20044

       Counsel for Amicus United States of America

---

O P I N I O N

---

**RENDELL,** <u>Circuit Judge</u>:

The issue presented before the en banc court is whether SB 2460, which the New Jersey Legislature enacted in 2014 to partially repeal certain prohibitions on sports gambling (the "2014 Law"), violates federal law.  2014 N.J. Sess. Law Serv. Ch. 62, codified at N.J. Stat. Ann. §§ 5:12A-7 to -9.  The District Court held that the 2014 Law violates the Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. §§ 3701-3704.  A panel of this Court affirmed this ruling in a divided opinion which was subsequently vacated upon the grant of the Petition for Rehearing en banc.  We now hold that the District Court

correctly ruled that because PASPA, by its terms, prohibits states from authorizing by law sports gambling, and because the 2014 Law does exactly that, the 2014 Law violates federal law. We also hold that we correctly ruled in *Christie I* that PASPA does not commandeer the states in a way that runs afoul of the Constitution.

## I. <u>Background</u>

Congress passed PASPA in 1992 to prohibit state-sanctioned sports gambling. PASPA provides:

> It shall be unlawful for—
>
> (1) a governmental entity to *sponsor, operate, advertise, promote, license, or authorize by law* or compact, or
>
> (2) a person to sponsor, operate, advertise, or promote, pursuant to the law or compact of a governmental entity, a lottery, sweepstakes, or other betting, gambling, or wagering scheme based . . . on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.

28 U.S.C. § 3702 (emphasis added). PASPA defines "governmental entity" to include states and their political subdivisions. *Id.* § 3701(2). It includes a remedial provision

7

that permits any sports league whose games are or will be the subject of sports gambling to bring an action to enjoin the gambling. *Id.* § 3703.

Congress included in PASPA exceptions for state-sponsored sports wagering in Nevada and sports lotteries in Oregon and Delaware, and also an exception for New Jersey but only if New Jersey were to enact a sports gambling scheme within one year of PASPA's enactment. *Id.* § 3704(a). New Jersey did not do so, and thus the PASPA exception expired. Notably, sports gambling was prohibited in New Jersey for many years by statute and by the New Jersey Constitution. *See, e.g.,* N.J. Const. Art. IV § VII ¶ 2; N.J. Stat. Ann. § 2C:37-2; N.J. Stat. Ann. § 2A:40-1. In 2010, however, the New Jersey Legislature held public hearings on the advisability of allowing sports gambling. These hearings included testimony that sports gambling would generate revenues for New Jersey's struggling casinos and racetracks. In 2011, the Legislature held a referendum asking New Jersey voters whether sports gambling should be permitted, and sixty-four percent voted in favor of amending the New Jersey Constitution to permit sports gambling. The constitutional amendment provided:

> It shall also be lawful for the Legislature to authorize by law wagering at casinos or gambling houses in Atlantic City on the results of any professional, college, or amateur sport or athletic event, except that wagering shall not be permitted on a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey

8

> college team participates regardless of
> where the event takes place . . . .

N.J. Const. Art. IV, § VII, ¶ 2(D).  The amendment thus permitted the New Jersey Legislature to "authorize by law" sports "wagering at casinos or gambling houses in Atlantic City," except that wagering was not permitted on New Jersey college teams or on any collegiate event occurring in New Jersey.  An additional section of the amendment permitted the Legislature to "authorize by law" sports "wagering at current or former running and harness horse racetracks," subject to the same restrictions regarding New Jersey college teams and collegiate events occurring in New Jersey.  *Id.* ¶ 2(F).

After voters approved the sports-wagering constitutional amendment, the New Jersey Legislature enacted the Sports Wagering Act in 2012 ("2012 Law"), which provided for regulated sports wagering at New Jersey's casinos and racetracks.  N.J. Stat. Ann. §§ 5:12A-1 *et seq.* (2012).  The 2012 Law established a comprehensive regulatory scheme, requiring licenses for operators and individual employees, extensive documentation, minimum cash reserves, and Division of Gaming Enforcement access to security and surveillance systems.

Five sports leagues[1] sued to enjoin the 2012 Law as violative of PASPA.[2]  The New Jersey Parties did not dispute

_____

[1] The sports leagues were the National Collegiate Athletic Association, National Football League, National Basketball Association, National Hockey League, and the Office of the Commissioner of Baseball, doing business as Major League Baseball (collectively, the "Leagues").

9

that the 2012 Law violated PASPA, but urged instead that PASPA was unconstitutional under the anti-commandeering doctrine. The District Court held that PASPA was constitutional and enjoined implementation of the 2012 Law. The New Jersey Parties appealed, and we affirmed in *National Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013) (*Christie I*).

In *Christie I*, we rejected the New Jersey Parties' argument that PASPA was unconstitutional by commandeering New Jersey's legislative process. In doing so, we stated that "[n]othing in [PASPA's] words *requires* that the states keep any law in place. All that is prohibited is

---

[2] The Leagues named as defendants Christopher J. Christie, the Governor of the State of New Jersey; David L. Rebuck, the Director of the New Jersey Division of Gaming Enforcement and Assistant Attorney General of the State of New Jersey; and Frank Zanzuccki, Executive Director of the New Jersey Racing Commission. The New Jersey Thoroughbred Horsemen's Association, Inc. ("NJTHA") intervened as a defendant, as did Stephen M. Sweeney, President of the New Jersey Senate, and Sheila Y. Oliver, Speaker of the New Jersey General Assembly ("State Legislators"). We collectively refer to these parties as the "New Jersey Parties." In the present case, the New Jersey Parties are the same, with some exceptions. NJTHA was named as a defendant (i.e., it did not intervene), as was the New Jersey Sports and Exposition Authority; the latter is not participating in this appeal. Additionally, Vincent Prieto, not Sheila Y. Oliver, is now the Speaker of the General Assembly.

the issuance of gambling 'license[s]' or the affirmative 'authoriz[ation] *by law*' of gambling schemes." *Id.* at 232 (alterations in original). The New Jersey Parties had urged that PASPA commandeered the state because it prohibited the repeal of New Jersey's prohibitions on sports gambling; they reasoned that repealing a statute barring an activity would be equivalent to authorizing the activity, and "authorizing" was not allowed by PASPA. We rejected that argument, observing that "PASPA speaks only of 'authorizing *by law*' a sports gambling scheme," and "[w]e [did] not see how having *no law* in place governing sports wagering is the same as authorizing it by law." *Id.* (emphasis in original). We further emphasized that "the lack of an affirmative prohibition of an activity does not mean it is *affirmatively* authorized by law. The right to do that which is not prohibited derives not from the authority of the state but from the inherent rights of the people." *Id.* (emphasis in original). In short, we concluded that the New Jersey Parties' argument rested on a "false equivalence between repeal and authorization." *Id.* at 233. The New Jersey Parties appealed to the Supreme Court of the United States, which denied certiorari.

Undeterred, in 2014, the Legislature passed the 2014 Law, SB 2460, which provided in part:

> [A]ny rules and regulations that may require or authorize any State agency to license, authorize, permit or otherwise take action to allow any person to engage in the placement or acceptance of any wager on any professional, collegiate, or amateur sport contest or athletic event, or that prohibit participation in or operation

11

of a pool that accepts such wagers, are
repealed to the extent they apply or may
be construed to apply at a casino or
gambling house operating in this State in
Atlantic City or a running or harness
horse racetrack in this State, to the
placement and acceptance of wagers on
professional, collegiate, or amateur sport
contests or athletic events . . . .

N.J. Stat. Ann. § 5:12A-7. The 2014 Law specifically
prohibited wagering on New Jersey college teams'
competitions and on any collegiate competition occurring in
New Jersey, and it limited sports wagering to "persons 21
years of age or older situated at such location[s]," namely
casinos and racetracks. *Id.*

## II. Procedural History and Parties' Arguments

The Leagues filed suit to enjoin the New Jersey Parties
from giving effect to the 2014 Law. The District Court held
that the 2014 Law violates PASPA, granted summary
judgment in favor of the Leagues, and issued a permanent
injunction against the Governor of New Jersey, the Director
of the New Jersey Division of Gaming Enforcement, and the
Executive Director of the New Jersey Racing Commission
(collectively, the "New Jersey Enjoined Parties").[3] The

---

[3] In the District Court, the New Jersey Enjoined Parties
urged that the Eleventh Amendment gave them immunity
such that they could not be sued in an action challenging the
2014 Law. The District Court rejected this argument, as do
we, and we note that, while the issue was briefed, the New
Jersey Enjoined Parties did not press—or even mention—this

issue at oral argument before either the merits panel or the en banc court. They contend that, because the 2014 Law is a self-executing repeal that requires no action from them or any other state official, they are immune from suit. This argument fails. The New Jersey Enjoined Parties are subject to suit under the *Ex parte Young* exception to Eleventh Amendment immunity, which "permit[s] the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (quoting *Ex parte Young*, 209 U.S. 123, 160 (1908)). The contrary argument of the New Jersey Enjoined Parties relies on a false premise that execution of the 2014 Law involves no affirmative *ultra vires* act by state officials. But the 2014 Law is far from passive. As we conclude at length, the 2014 Law establishes a regulatory regime that authorizes wagering on sports in limited locations for particular persons, so it is an affirmative act by New Jersey state officials to authorize by law sports betting, in violation of PASPA. As such, implementation of the law falls squarely within the *Ex parte Young* exception to sovereign immunity because it is "simply an illegal act upon the part of a state official in attempting, by the use of the name of the state, to enforce a legislative enactment which is void because" it is contrary to federal law. 209 U.S. at 159. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (internal quotation marks and alterations omitted). That is precisely the situation we face in

13

District Court interpreted *Christie I* as holding that PASPA offers two choices to states: maintaining prohibitions on sports gambling or completely repealing them. It reasoned that the 2014 Law runs afoul of PASPA because the 2014 Law is a partial repeal that necessarily results in sports wagering with the State's imprimatur. The New Jersey Parties appealed.

On appeal, the New Jersey Parties argue that the 2014 Law does not constitute an authorization in violation of PASPA and it is consistent with *Christie I* because the New Jersey Legislature effected a repealer as *Christie I* specifically permitted.

The Leagues urge that the 2014 Law violates PASPA because it "authorizes by law" sports wagering and also impermissibly "licenses" the activity by confining the repeal of gambling prohibitions to licensed gambling facilities and thus, in effect, enlarging the terms of existing gaming licenses. The United States submitted an amicus brief in support of the Leagues.

A panel of this Court affirmed in a divided opinion, which was subsequently vacated. Because we, sitting en banc, essentially agree with the reasoning of the panel majority's opinion, we incorporate much of it verbatim in this opinion.

---

this case. We therefore need not address the unsettled question of whether an *Ex parte Young* exception must exist in the case of a truly self-executing law because the 2014 Law is not one.

**III.** **Analysis**[4]

A. The 2014 Law Violates PASPA

As a preliminary matter, we acknowledge the 2014 Law's salutary purpose in attempting to legalize sports gambling to revive its troubled casino and racetrack industries. The New Jersey Assembly Gaming and Tourism Committee chairman stated, in regard to the 2014 Law, that "[w]e want to give the racetracks a shot in the arm. We want to help Atlantic City. We want to do something for the gaming business in the state of New Jersey, which has been under tremendous duress . . . ." (App. 91.) New Jersey State Senator Ray Lesniak, a sponsor of the law, has likewise stated that "[s]ports betting will be a lifeline to the casinos, putting people to work and generating economic activity in a growth industry." (App. 94.) And New Jersey State Senator Joseph Kyrillos stated that "New Jersey's continued prohibition on sports betting at our casinos and racetracks is contrary to our interest of supporting employers that provide tens of thousands of jobs and add billions to our state's economy" and that "[s]ports betting will help set New Jersey's wagering facilities apart from the competition and strengthen Monmouth Park and our struggling casino industry." (App. 138.) PASPA has clearly stymied New Jersey's attempts to

---

[4] "We review a district court's grant of summary judgment *de novo* . . . ." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011). "We review a district court's grant of a permanent injunction for abuse of discretion." *Meyer v. CUNA Mut. Ins. Soc'y*, 648 F.3d 154, 162 (3d Cir. 2011).

15

revive its casinos and racetracks and provide jobs for its workforce.

Moreover, PASPA is not without its critics, even aside from its economic impact. It has been criticized for prohibiting an activity, i.e., sports gambling, that its critics view as neither immoral nor dangerous. It has also been criticized for encouraging the spread of illegal sports gambling and for making it easier to fix games, since it precludes the transparency that accompanies legal activities. Simply put, "[w]e are cognizant that certain questions related to this case—whether gambling on sporting events is harmful to the games' integrity and whether states should be permitted to license and profit from the activity—engender strong views." *Christie I*, 730 F.3d at 215. While PASPA's provisions and its reach are controversial (and, some might say, unwise), "we are not asked to judge the wisdom of PASPA" and "[i]t is not our place to usurp Congress' role simply because PASPA may have become an unpopular law." *Id.* at 215, 241. We echo *Christie I* in noting that "New Jersey and any other state that may wish to legalize gambling on sports . . . are not left without redress. Just as PASPA once gave New Jersey preferential treatment in the context of gambling on sports, Congress may again choose to do so or . . . may choose to undo PASPA altogether." *Id.* at 240-41. Unless that happens, however, we are duty-bound to interpret the text of the law as Congress wrote it.

We now turn to the primary question before us: whether the 2014 Law violates PASPA. We hold that it does. Under PASPA, it shall be unlawful for "a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact" sports gambling. 28 U.S.C. § 3702(1).

16

We conclude that the 2014 Law violates PASPA because it authorizes by law sports gambling.

*First*, the 2014 Law authorizes casinos and racetracks to operate sports gambling while other laws prohibit sports gambling by all other entities. Without the 2014 Law, the sports gambling prohibitions would apply to casinos and racetracks. Appellants urge that the 2014 Law does not provide authority for sports gambling because we previously held that "[t]he right to do that which is not prohibited derives not from the authority of the state but from the inherent rights of the people" and that "[w]e do not see how having *no law* in place governing sports wagering is the same as authorizing it by law." *Christie I*, 730 F.3d at 232. But this is not a situation where there are *no* laws governing sports gambling in New Jersey. Absent the 2014 Law, New Jersey's myriad laws prohibiting sports gambling would apply to the casinos and racetracks. Thus, the 2014 Law provides the authorization for conduct that is otherwise clearly and completely legally prohibited.

*Second*, the 2014 Law authorizes sports gambling by selectively dictating where sports gambling may occur, who may place bets in such gambling, and which athletic contests are permissible subjects for such gambling. Under the 2014 Law, New Jersey's sports gambling prohibitions are specifically removed from casinos, gambling houses, and horse racetracks as long as the bettors are people age 21 or over, and as long as there are no bets on either New Jersey college teams or collegiate competitions occurring in New Jersey. The word "authorize" means, inter alia, "[t]o empower; to give a right or authority to act," or "[t]o permit a thing to be done in the future." Black's Law Dictionary 133

17

(6th ed. 1990).[5]  The 2014 Law allows casinos and racetracks and their patrons to engage, under enumerated circumstances, in conduct that other businesses and their patrons cannot do. That selectiveness constitutes specific permission and empowerment.

Appellants urge that because the 2014 Law is only a "repeal" removing prohibitions against sports gambling, it is not an "affirmative authorization" under *Christie I*. To the extent that in *Christie I* we took the position that a repeal cannot constitute an authorization, we now reject that reasoning. Moreover, we do not adopt the District Court's view that the options available to a state are limited to two. Neither of these propositions were necessary to their respective rulings and were, in essence, dicta. Furthermore, our discussion of partial versus total repeals is similarly unnecessary to determining the 2014 Law's legality because the question presented here is straightforward—i.e., what does the law do—and does not turn on the way in which the state has enacted its directive.

The presence of the word "repeal" does not prevent us from examining what the provision actually does, and the Legislature's use of the term does not change  that the 2014 Law selectively grants permission to certain entities to engage in sports gambling.  New Jersey's sports gambling prohibitions remain, and no one may engage in such conduct except those singled out in the 2014 Law.  While artfully couched in terms of a repealer, the 2014 Law essentially

---

[5] We cite the version of Black's Law Dictionary that was current in 1992, the year PASPA was passed.

18

provides that, notwithstanding any other prohibition by law, casinos and racetracks shall hereafter be permitted to have sports gambling. This is an authorization.

*Third*, the exception in PASPA for New Jersey, which the State did not take advantage of before the one-year time limit expired, is remarkably similar to the 2014 Law. The exception states that PASPA does not apply to "a betting, gambling, or wagering scheme . . . conducted exclusively in casinos . . . , but only to the extent that . . . any commercial casino gaming scheme was in operation . . . throughout the 10-year period" before PASPA was enacted. 28 U.S.C. § 3704(a)(3)(B). The exception would have permitted sports gambling at New Jersey's casinos, which is just what the 2014 Law does. We can easily infer that, by explicitly excepting a scheme of sports gambling in New Jersey's casinos from PASPA's prohibitions, Congress intended that such a scheme would violate PASPA. If Congress had not perceived that sports gambling in New Jersey's casinos would violate PASPA, then it would not have needed to insert the New Jersey exception. In other words, if sports gambling in New Jersey's casinos does not violate PASPA, then PASPA's one-year exception for New Jersey would have been superfluous. We will not read statutory provisions to be surplusage. *See Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1178 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."). In order to avoid rendering the New Jersey exception surplusage, we

19

must read the 2014 Law as authorizing a scheme that clearly violates PASPA.[6]

As support for their argument that the 2014 Law does not violate PASPA, Appellants cite the 2014 Law's construction provision, which provides that "[t]he provisions of this act . . . are not intended and shall not be construed as causing the State to sponsor, operate, advertise, promote, license, or authorize by law or compact" sports wagering. N.J. Stat. Ann. § 5:12A-8. This conveniently mirrors PASPA's language providing that states may not "sponsor, operate, advertise, promote, license, or authorize by law or compact" sports wagering. 28 U.S.C. § 3702(1).

The construction provision does not save the 2014 Law. States may not use clever drafting or mandatory construction provisions to escape the supremacy of federal law. *Cf. Haywood v. Drown*, 556 U.S. 729, 742 (2009) ("[T]he Supremacy Clause cannot be evaded by formalism."); *Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 382-83 (1990) ("[t]he force of the Supremacy Clause is not so weak that it can be evaded by mere mention of" a particular word). In the same vein, the New Jersey Legislature cannot use a targeted construction provision to limit the reach of PASPA or to dictate to a court a construction that would limit that reach.

_____

[6] Granted, the 2014 Law applies to horse racetracks as well as casinos, while the PASPA exception for New Jersey refers only to casinos, but that does not change the significance of the New Jersey exception because it refers to gambling in places that already allow gambling, and the racetracks fall within that rubric.

The 2014 Law violates PASPA, and the construction provision cannot alter that fact.

Appellants also draw a comparison between the 2014 Law and the 2012 Law, which involved a broad regulatory scheme, as evidence that the 2014 Law does not violate PASPA. It is true that the 2014 Law does not set forth a comprehensive scheme or provide for a state regulatory role, as the 2012 Law did. However, PASPA does not limit its reach to active state involvement or extensive regulation of sports gambling. It prohibits a range of state activity, the least intrusive of which is "authorization" by law of sports gambling.

We conclude that the 2014 Law violates PASPA because it authorizes by law sports gambling.[7]

_____

[7] Because we conclude that the 2014 Law authorizes by law sports gambling, we need not address the argument made by Appellees and Amicus that the 2014 Law also licenses sports gambling by permitting only those entities that already have gambling licenses or recently had such licenses to conduct sports gambling operations. We also reject the argument of the State Legislators and the NJTHA that, to the extent that any aspect of the 2014 Law violates PASPA, we should apply the 2014 Law's severability clause. Citing the broadly-worded severability provision of N.J. Stat. Ann. § 5:12A-9, they argue that the District Court should have saved the 2014 Law by severing the most objectionable parts. For example, the NJTHA urges that, "if the Court . . . concludes that a state decision to prohibit persons under 21 from making sports bets is [an] authorization by law for that activity by persons over 21, the age limitation could be severed, leaving

21

it to the sports gambling operators . . . to impose a reasonable age limit." NJTHA's Reply Br. at 23. It also argues that, "if the Court concludes that a state decision to prohibit . . . sports betting on some games is [an] authorization by law as to betting on all other games, this limitation could be severed," and that "the Court can sever the Law's provision dealing with casinos from its provision dealing with racetracks." *Id.* at 24. Lifting the age limitation, permitting betting on New Jersey schools' games, or limiting the authorization to an even narrower category of venues, however, would not alter our conclusion that the 2014 Law authorizes by law sports betting. "The standard for determining the severability of an unconstitutional provision is well established: Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (internal quotation marks omitted). Because New Jersey's legislature, in both the 2012 Law and the 2014 Law, was loath to permit sports betting outside of gambling establishments, we cannot reasonably say that it would have enacted a repeal of its gambling laws without the age restriction, without the restriction on gambling on New Jersey-based college sports, and without the geographic restriction to casinos and racetracks. We thus need not speculate about other possible forms that severance might take.

B. PASPA Does Not Impermissibly Commandeer the States

Appellants expend significant effort in this appeal revisiting our conclusion in *Christie I* that PASPA does not unconstitutionally commandeer the states. They root this effort in the District Court's erroneous conclusion that PASPA presents states with a binary choice—either maintain a complete prohibition on sports wagering or wholly repeal state prohibitions. In *Christie I*, we engaged in a lengthy discussion to rebut Appellants' assertion that if we conclude that New Jersey's repeal of its prohibition is not permitted by PASPA, then it has unconstitutionally commandeered New Jersey. In so doing, we discussed the Supreme Court's clear case law on commandeering. Our prior conclusion that PASPA does not run afoul of anti-commandeering principles remains sound despite Appellants' attempt to call it into question using the 2014 Law as an exemplar.

### 1. Anti-Commandeering Jurisprudence

As we noted in *Christie I*, the Supreme Court's anti-commandeering principle rests on the conclusion that "Congress 'lacks the power directly to compel the States to require or prohibit' acts which Congress itself may require or prohibit." *Christie I*, 730 F.3d at 227 (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)). In our prior survey of the anti-commandeering case law in *Christie I*, we grouped four commandeering cases upholding the federal laws at issue into two categories: (1) permissible regulation in a pre-emptible field, *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981), and *F.E.R.C. v. Mississippi*, 456 U.S. 742 (1982); and (2) prohibitions on state action,

*South Carolina v. Baker*, 485 U.S. 505 (1988) and *Reno v. Condon*, 528 U.S. 141 (2000). The Supreme Court has struck down federal laws on anti-commandeering grounds in only two cases, *New York v. United States* and *Printz v. United States*, 521 U.S. 898 (1997). We summarize our prior review below.

*First*, congressional action in passing laws in otherwise pre-emptible fields has withstood attack in cases where the states were not compelled to enact laws or implement federal statutes or regulatory programs themselves. In *Hodel*, the Supreme Court upheld the constitutionality of a law that imposed federal standards for coal mining. The law left states a choice. A state could "assume permanent regulatory authority over . . . surface coal mining operations" and "submit a proposed permanent program" that "demonstrate[s] that the state legislature has enacted laws implementing the environmental protection standards . . . and that the State has the administrative and technical ability to enforce the[] standards." *Hodel*, 452 U.S. at 271. However, if a state chose not to assume regulatory authority, the federal government would "administer[] the Act within that State and continue[] as such unless and until a 'state program' [wa]s approved." *Id.* at 272. As we described in *Christie I*:

> The Supreme Court upheld the provisions, noting that they neither compelled the states to adopt the federal standards, nor required them "to expend any state funds," nor coerced them into "participat[ing] in the federal regulatory program in any manner whatsoever." [*Hodel*, 452 U.S.] at 288. The Court further concluded

24

that Congress could have chosen to completely preempt the field by simply assuming oversight of the regulations itself. *Id.* It thus held that the Tenth Amendment posed no obstacle to a system by which Congress "chose to allow the States a regulatory role." *Id.* at 290. As the Court later characterized *Hodel,* the scheme there did not violate the anti-commandeering principle because it "merely made compliance with federal standards a precondition to continued state regulation in an otherwise pre-empted field." *Printz v. United States,* 521 U.S. 898, 926 (1997).

*Christie I*, 730 F.3d at 227–28. The Supreme Court's opinion in *F.E.R.C. v. Mississippi* the following year confirmed its view that a law does not unconstitutionally commandeer the states when the law does not impose federal requirements on the states, but leaves states the choice to decline to implement federal standards. 456 U.S. 742, 767–68 (upholding a provision that required state utility companies to expend state resources to "consider" enacting federal standards, but did not require states to enact those standards).

*Second*, the Supreme Court has found Congress's prohibition of certain state actions to not constitute unconstitutional commandeering. In *South Carolina v. Baker*, the Court upheld federal laws that prohibited the issuance of bearer bonds, which required states to amend legislation to be in compliance. 485 U.S. at 511, 514 (1988). As we characterized this case in *Christie I*:

25

> The Court concluded this result did not run afoul [of] the Tenth Amendment because it did not seek to control or influence the manner in which States regulate private parties but was simply an inevitable consequence of regulating a state activity. In subsequent cases, the Court explained that the regulation in *Baker* was permissible because it simply subjected a State to the same legislation applicable to private parties.

*Christie I*, 730 F.3d at 228 (internal quotation marks and citations omitted). Later, in *Reno v. Condon*, the Court upheld the constitutionality of a law that prohibited states from releasing information gathered by state departments of motor vehicles. The Court ultimately concluded that the law at issue "d[id] not require the States in their sovereign capacity to regulate their own citizens[,] . . . d[id] not require the [State] Legislature[s] to enact any laws or regulations, and it d[id] not require state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno*, 528 U.S. at 151 (as altered in *Christie I*, 730 F.3d at 228).

As noted above, the Supreme Court has invalidated laws on anti-commandeering grounds on only two occasions. In *New York*, the Supreme Court struck down a "take-title" provision whereby states were required to take title to radioactive waste by a specific date, at the waste generator's request, if they did not adopt a federal program. As we stated in *Christie I*, the provision "compel[led] the states to either enact a regulatory program, or expend resources in taking title to the waste." *Christie I*, 730 F.3d at 229. The Supreme Court ultimately concluded in *New York* that the take-title

26

provision "crossed the line distinguishing encouragement from coercion." 505 U.S. at 175. Similarly in *Printz v. United States*, the Supreme Court concluded that Congress "may neither issue directives requiring the States to address particular problems, nor command the States' officers . . . to administer or enforce a federal regulatory program." 521 U.S. at 935 (finding a federal law requiring state officers to conduct background checks on prospective gun owners to commandeer the states in violation of the Tenth Amendment).

### 2. PASPA Does Not Violate Anti-Commandeering Principles

We continue to view PASPA's prohibition as more akin to those laws upheld in *Hodel*, *F.E.R.C.*, *Baker*, and *Reno*, and distinguishable from those struck down by the Supreme Court in *New York* and *Printz*. Our articulation of the way in which PASPA does not violate anti-commandeering principles warrants refinement, however, given the way in which the 2014 Law attempted to skirt PASPA and the thrust of Appellants' arguments in this appeal.

In an attempt to reopen the anti-commandeering question we previously decided, Appellants creatively rely on certain language that was used in *Christie I*. In pressing for a declaration that PASPA unconstitutionally commandeered the states in *Christie I*, Appellants characterized PASPA as requiring the states to affirmatively keep a prohibition against sports wagering on their books, lest they be found to have authorized sports gambling by law by repealing the prohibition. In response, we opined that Appellants' position "rest[ed] on a false equivalence between repeal and

27

authorization," implying that a repeal is not an authorization. 730 F.3d at 233. Before us now Appellants urge that "[t]his Court held [in *Christie I*] that PASPA is constitutional *precisely because* it permits States to elect *not to prohibit* sports wagering, even if *affirmatively authorizing* it would be unlawful." Appellants' Br. 22 (emphasis in original). Appellants are saying, in effect, "We told you so"—if the legislature cannot repeal New Jersey's prohibition as it attempted to do in the 2014 Law, then it is required to affirmatively keep the prohibition on the books, and PASPA unconstitutionally commandeers the states. We reject this argument.

That said, we view our discussion in *Christie I* regarding the relationship between a "repeal" and an "authorization" to have been too facile. While we considered whether repeal and authorization are interchangeable, our decision did not rest on that discussion. Today, we choose to excise that discussion from our prior opinion as unnecessary dicta. To be clear, a state's decision to selectively remove a prohibition on sports wagering in a manner that permissively channels wagering activity to particular locations or operators is, in essence, "authorization" under PASPA. However, our determination that such a selective repeal of certain prohibitions amounts to authorization under PASPA does not mean that states are not afforded sufficient room under PASPA to craft their own policies.

Appellants urge that our conclusion in *Christie I* that PASPA does not unconstitutionally commandeer the states rested on our view that PASPA allows states to "choos[e] among many different potential policies on sports wagering that do not include licensing or affirmative authorization by

28

the State." Appellants' Br. 29. This is correct. PASPA does not command states to take affirmative actions, and it does not present a coercive binary choice. Our reasoning in *Christie I* that PASPA does not commandeer the states remains unshaken.

Appellants characterize the 2014 Law as a lawful exercise in the space PASPA affords states to create their own policy. They argue that without options beyond a complete repeal or a complete ban on sports wagering, such as the partial repeal New Jersey pursued, PASPA runs afoul of anti-commandeering principles. This argument sweeps too broadly. That a specific partial repeal which New Jersey chose to pursue in its 2014 Law is not valid under PASPA does not preclude the possibility that other options may pass muster. The issue of the extent to which a given repeal would constitute an authorization, in a vacuum, is not before us, as it was not specifically before us in *Christie I*. However, as the Leagues noted at oral argument before the en banc court, not all partial repeals are created equal. For instance, a state's partial repeal of a sports wagering ban to allow *de minimis* wagers between friends and family would not have nearly the type of authorizing effect that we find in the 2014 Law. We need not, however, articulate a line whereby a partial repeal of a sports wagering ban amounts to an authorization under PASPA, if indeed such a line could be drawn. It is sufficient to conclude that the 2014 Law overstepped it.

Appellants seize on the District Court's erroneous interpretation of *Christie I*'s anti-commandeering analysis— namely, that PASPA presents states with a strict binary choice between total repeal and keeping a complete ban on their books—to once again urge that if PASPA commands

such a choice, then it is comparable to the challenged law in *New York*. First, unlike the take-title provision included in the statute at issue in *New York*, PASPA's text does not present states with a coercive choice to adopt a federal program. To interpret PASPA to require such a coercive choice is to read something into the statute that simply is not there.

Second, PASPA is further distinguishable from the law at issue in *New York* because it does not require states to take any action. In *New York*, the Supreme Court held that a federal law that required states to enact a federal regulatory program or take title to radioactive waste at the behest of generators "crossed the line distinguishing encouragement from coercion." 505 U.S. at 175. Unlike the law at issue in *New York*, PASPA includes no coercive direction by the federal government. As we previously concluded in *Christie I*, PASPA does not command states to take any affirmative steps:

> PASPA does not *require* or coerce the states to lift a finger—they are not required to pass laws, to take title to anything, to conduct background checks, to expend any funds, or to in any way enforce federal law. They are not even required, like the states were in *F.E.R.C.,* to expend resources considering federal regulatory regimes, let alone to adopt them. Simply put, we discern in PASPA no directives requiring the States to address particular problems and no commands to the States' officers to administer or enforce a federal regulatory program.

730 F.3d at 231 (internal quotation marks and alterations omitted) (emphasis in original).  Put simply, PASPA does not impose a coercive either-or requirement or affirmative command.

We will not allow Appellants to bootstrap already decided questions of PASPA's constitutionality onto our determination that the 2014 Law violates PASPA.  We reject the notion that PASPA presents states with a coercive binary choice or affirmative command and conclude, as we did in *Christie I*, that it does not unconstitutionally commandeer the states.

## IV. <u>Conclusion</u>

The 2014 Law violates PASPA because it authorizes by law sports gambling.  We continue to find PASPA constitutional.  We will affirm.

FUENTES *joined by* RESTREPO, *Circuit Judges*, dissenting:

In November 2011, the question of whether to allow sports betting in New Jersey went before the electorate. By a 2-1 margin, New Jersey voters passed a referendum to amend the New Jersey Constitution to allow the New Jersey Legislature to "authorize by law" sports betting.[1] Accordingly, the Legislature enacted the 2012 Sports Wagering Act ("2012 Law"). The Sports Leagues challenged this Law, claiming that it violated the Professional and Amateur Sports Protection Act's ("PASPA") prohibition on states "authoriz[ing] by law" sports betting.[2] In *Christie I*, we agreed with the Sports Leagues and held that the 2012 Law violated and thus was preempted by PASPA. We explained, however, that New Jersey was free to repeal the sports betting prohibitions it already had in place. We rejected the argument that a repeal of prohibitions on sports betting was equivalent to authorizing by law sports betting. When the matter was brought to the Supreme Court, the Solicitor General echoed that same sentiment, stating that, "PASPA does not even obligate New Jersey to leave in place the state-law prohibitions against sports gambling that it had chosen to adopt prior to PASPA's enactment. To the contrary, New Jersey is free to repeal those prohibitions in whole or in part."[3]

---

[1] N.J. Const. art. IV, § 7, ¶ 2(D).

[2] *See* 28 U.S.C. § 3702(1).

[3] Br. for the United States in Opp'n at 11, *Christie v. Nat'l Collegiate Athletic Ass'n*, Nos. 13-967, 13-979, and 13-980 (U.S. May 14, 2014).

1

So New Jersey did just that. In 2014, the New Jersey Legislature repealed certain sports betting prohibitions at casinos and gambling houses in Atlantic City and at horse racetracks in the State ("2014 Repeal"). In addition to repealing the 2012 Law in full, the 2014 Repeal stripped New Jersey of *any* involvement in sports betting, regulatory or otherwise. In essence, the 2014 Repeal rendered previous prohibitions on sports betting non-existent.

But the majority today concludes that the New Jersey Legislature's efforts to satisfy its constituents while adhering to our decision in *Christie I* are still in violation of PASPA. According to the majority, the "selective" nature of the 2014 Repeal *amounts to* "authorizing by law" a sports wagering scheme. That is, because the State retained certain restrictions on sports betting, the majority *infers* the authorization by law. I cannot agree with this interpretation of PASPA.

PASPA restricts the states in six ways – a state cannot "sponsor, operate, advertise, promote, license, or *authorize by law* or compact" sports betting.[4] The only one of these six restrictions that includes "by law" is "authorize." None of the other restrictions say anything about *how* the states are restricted. Thus, I believe that Congress gave this restriction a special meaning—that a state's "authoriz[ation] by law" of sports betting cannot merely be inferred, but rather requires a specific legislative enactment that affirmatively allows the people of the state to bet on sports. Any other interpretation would be reading the phrase "by law" out of the statute.

---

[4] 28 U.S.C. § 3702(1) (emphasis added).

Indeed, we stated exactly this in *Christie I*—that all PASPA prohibits is "the affirmative 'authoriz[ation] *by law*' of gambling schemes."[5]   Thus, we explained, nothing prevented New Jersey from repealing its sports betting prohibitions, since, "in reality, the lack of an affirmative prohibition of an activity does not mean it is *affirmatively* authorized by law."[6]   As we noted, "that the Legislature needed to enact the [2012 Law] itself belies any contention that the mere repeal of New Jersey's ban on sports gambling was sufficient to 'authorize [it] by law.'"[7]   The Legislature itself "saw a meaningful distinction between repealing the ban on sports wagering and authorizing it by law, undermining any contention that the amendment alone was sufficient to affirmatively authorize sports wagering—the [2012 Law] was required."[8]   In short, we explained that there was a false equivalence between repeal and authorization.

With the 2014 Repeal, the New Jersey Legislature did what it thought it was permitted to do under our reading of PASPA in *Christie I*.  The majority, however, maintains that the 2014 Repeal "authorizes" sports wagering at casinos, gambling houses, and horse racetracks simply because other sports betting prohibitions remain in place.[9]  According to the

---

[5] *Christie I*, 730 F.3d at 232 (alteration in original).

[6] *Id.*

[7] *Id.* (alteration in original).

[8] *Id.*

[9] I refer to the repeal of prohibitions as applying to casinos, gambling houses, and horse racetracks, with the understanding that the repeal applies to casinos and gambling houses in Atlantic City and horse racetracks in New Jersey

3

majority, "[a]bsent the 2014 Law, New Jersey's myriad laws prohibiting sports gambling would apply to the casinos and racetracks," and thus "the 2014 Law provides the authorization for conduct that is otherwise clearly and completely legally prohibited."[10] But I believe the majority is mistaken as to the impact of a partial repeal.

A repeal is defined as an "abrogation of an existing law by legislative act."[11] When a statute is repealed, "the repealed statute, in regard to its operative effect, is considered as if it had never existed."[12] If a repealed statute is treated as if it never existed, a partially repealed statute is treated as if the repealed sections never existed.[13] The 2014 Repeal, then, simply returns New Jersey to the state it was in before it first

---

for those over 21 not betting on New Jersey collegiate teams or any collegiate competition occurring in New Jersey.

[10] Maj. Op. 17.

[11] Black's Law Dictionary 1325 (8th ed. 2007).

[12] 73 Am. Jur. 2d Statutes § 264.

[13] *See, e.g.*, *Ex parte McCardle*, 74 U.S. 506, 514 (1868) ("[W]hen an act of the legislature is repealed, it must be considered . . . as if it never existed."); *Anderson v. USAir, Inc.*, 818 F.2d 49, 55 (D.C. Cir. 1987) ("Common sense dictates that repeal means a deletion. This court would engage in pure speculation were it to hold otherwise."); *Kemp by Wright v. State, Cty. of Burlington*, 687 A.2d 715, 723 (N.J. 1997) ("In this State it is the general rule that where a statute is repealed and there is no saving[s] clause or a general statute limiting the effect of the repeal, the repealed statute, in regard to its operative effect, is considered as though it had never existed, except as to matters and transactions passed and closed.").

4

enacted those prohibitions on sports gambling. In other words, after the repeal, it is as if New Jersey *never* prohibited sports wagering at casinos, gambling houses, and horse racetracks. Therefore, with respect to those locations, there are no laws governing sports wagering. Contrary to the majority's position, the permission to engage in such an activity is not affirmatively granted *by virtue of* it being prohibited elsewhere.

To bolster its position, the majority rejects our reasoning in *Christie I*, stating that "[t]o the extent that in *Christie I* we took the position that a repeal cannot constitute an authorization, we now reject that reasoning."[14] I continue to maintain, however, that the 2014 Repeal *is not* an affirmative authorization by law. It is merely a repeal – it does not, and cannot, authorize by law anything.

In my view, the majority's position that the 2014 Repeal "selectively grants permission to certain entities to engage in sports gambling"[15] is simply incorrect. There is no explicit grant of permission in the 2014 Repeal for any person or entity to engage in sports gambling. Rather, the 2014 Repeal is a self-executing deregulatory measure that repeals existing prohibitions and regulations for sports betting and requires the State to abdicate *any* control or involvement in sports betting.[16] The majority fails to explain why a partial

---

[14] Maj. Op. 18.

[15] *Id.*

[16] For example, under the 2014 Repeal, "[the Division of Gaming Enforcement ("DGE")] now considers sports wagering to be 'non-gambling activity' . . . that is beyond

5

repeal is equivalent to a grant of permission (by law) to engage in sports betting.

Suppose the State did exactly what the majority suggests it could have done: repeal completely its sports betting prohibitions. In that circumstance, sports betting could occur anywhere in the State and there would be no restrictions as to age, location, or whether a bettor could wager on games involving local teams. Would the State violate PASPA if it later enacted limited restrictions regarding age requirements and places where wagering could occur? Surely no conceivable reading of PASPA would preclude a state from *restricting* sports wagering in this scenario. Yet the 2014 Repeal comes to the same result.

The majority also fails to illustrate how the 2014 Repeal results in sports wagering *pursuant to state law* when there is effectively no law in place as to several locations, no scheme created, and no state involvement. A careful comparison with the 2012 Law is instructive. The 2012 Law lifted New Jersey's ban on sports wagering and created a licensing scheme for sports wagering pools at casinos and racetracks in the State. This comprehensive regime required close State supervision and regulation of those sports wagering pools. For instance, the 2012 Law required any entity that wished to operate a "sports pool lounge" to acquire a "sports pool license." To do so, a prospective operator was required to pay a $50,000 application fee, secure Division of Gaming Enforcement ("DGE") approval of all internal controls, and ensure that any of its employees who were to be

---

DGE's control and outside of DGE's regulatory authority." App. 416.

6

directly involved in sports wagering obtained individual licenses from the DGE and the Casino Control Commission ("CCC"). In addition, the betting regime required entities to, among other things, submit extensive documentation to the DGE, adopt new "house" rules subject to DGE approval, and conform to DGE standards. This, of course, violated PASPA in the most basic way: New Jersey developed an intricate scheme that both "authorize[d] *by law*" and "license[d]" sports gambling. The 2014 Repeal eliminated this entire scheme. Moreover, all state agencies with jurisdiction over state casinos and racetracks, such as the DGE and the CCC, were stripped of any sports betting oversight.

The majority likewise falters when it analogizes the 2014 Repeal to the exception Congress originally offered to New Jersey in 1992. The exception stated that PASPA did not apply to "a betting, gambling, or wagering scheme . . . conducted exclusively in casinos[,] . . . but only to the extent that . . . any commercial casino gaming scheme was in operation . . . throughout the 10-year period" before PASPA was enacted.[17] Setting aside the most obvious distinction between the 2014 Repeal and the 1992 exception—that it contemplated a *scheme* that the 2014 Repeal does not authorize—the majority misses the mark when it states: "If Congress had not perceived that sports gambling in New Jersey's casinos would violate PASPA, then it would not have needed to insert the New Jersey exception."[18] Congress did not, however, perceive, or intend for, private sports wagering in casinos to violate PASPA. Instead, Congress prohibited sports wagering undertaken pursuant to state law.

---

[17] 28 U.S.C. § 3704(a)(3)(B).
[18] Maj. Op. 19.

7

That the 2014 Repeal might bring about an increase in the amount of private, legal sports wagering in New Jersey is of no moment, and the majority's reliance on such a possibility is misplaced. The majority is also wrong in a more fundamental way. The exception Congress offered to New Jersey was exactly that: an *exception* to the ordinary prohibitions of PASPA. That is to say, with this exception, New Jersey could have "sponsor[ed], operate[d], advertise[d], promote[d], license[d], or authorize[d] by law or compact" sports wagering. Under the 2014 Repeal, of course, New Jersey cannot and does not aim to do any of these things.

Because I do not see how a partial repeal of prohibitions is tantamount to authorizing by law a sports wagering scheme in violation of PASPA, I respectfully dissent.

8

NCAA v. Governor of the State of New Jersey, et al., Nos. 14-4546, 14-4568, 14-4659

VANASKIE, *Circuit Judge*, dissenting.

While Congress "has the authority under the Constitution to pass laws requiring or prohibiting certain acts, *it lacks the power directly to compel the States to require or prohibit those acts*." *New York v. United States*, 505 U.S. 144, 166 (1992) (emphasis added). Concluding that the Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3701 *et seq*., was a congressional command that States must prohibit wagering on sporting events because it forbids the States from "authoriz[ing] by law" such activity, I dissented from the holding in *Christie I* that PASPA was a valid exercise of congressional authority. *National Collegiate Athletic Ass'n v. Governor of New Jersey* (*Christie I*), 730 F.3d 208, 241–51 (3d Cir. 2013) (Vanaskie, J., dissenting). My colleagues in the majority in *Christie I* disagreed with my conclusion because they believed that States had the option of repealing existing bans on sports betting. *Id*. at 232. In upholding PASPA, *Christie I* rejected New Jersey's argument that a repeal of its ban on sports betting would be viewed as effectively "authoriz[ing] by law" this activity. *Christie I* declared that New Jersey's "attempt to read into PASPA a requirement that the states must affirmatively keep a ban on sports gambling in their books rests on a false equivalence between repeal and authorization." *Id*. at 233. I viewed that "false equivalence" assertion with considerable skepticism. *Id*. at 247 n. 5 ("[I]t certainly is open to debate whether a state's repeal of a ban on sports gambling would be akin to that state's 'authorizing' gambling on sporting events . . . ."). My skepticism is validated by today's majority opinion. The majority dodges the inevitable conclusion that PASPA

1

conscripts the States to prohibit wagering on sports by suggesting that some partial repeal of the ban on sports gambling would not be tantamount to authorization of gambling.

Implicit in today's majority opinion and *Christie I* is the premise that Congress lacks the authority to decree that States must prohibit sports wagering, and so both majorities find some undefined room for States to enact partial repeals of existing bans on sports gambling. While the author of *Christie I* finds that New Jersey's partial repeal at issue here is not the equivalent of authorizing by law wagering on sporting events, today's majority concludes otherwise. This shifting line approach to a State's exercise of its sovereign authority is untenable. The bedrock principle of federalism that Congress may not compel the States to require or prohibit certain activities cannot be evaded by the false assertion that PASPA affords the States some undefined options when it comes to sports wagering. Because I believe that PASPA was intended to compel the States to prohibit wagering on sporting events, it cannot survive constitutional scrutiny. Accordingly, as I did in *Christie I*, I dissent.

## I.

According to the majority, "a state's decision to selectively remove a prohibition on sports wagering in a manner that permissively channels wagering activity to particular locations or operators is, in essence, 'authorization' under PASPA." Maj. Op., at 28. The majority also claims "a state's partial repeal of a sports wagering ban to allow *de minimis* wagers between friends and family would not have nearly the type of authorizing effect that we find in the 2014 Law." *Id.* at 29. Thus, according to the majority, the 2014

2

Law is a partial repeal that is foreclosed by PASPA, but "other options may pass muster" because "not all partial repeals are created equal." *Id.*

Noticeably, the majority does not explain why all partial repeals are not created equal or explain what distinguishes the 2014 Law from those partial repeals that pass muster. To further complicate matters, the majority continues to rely on *Christie I,* which did "not read PASPA to prohibit New Jersey from repealing its ban on sports wagering" and informed New Jersey that "[n]othing in [PASPA's] words *requires* that the states keep any law in place." 730 F.3d at 232.

## A.

*Christie I* "[r]ecogniz[ed] the importance of the affirmative/negative command distinction," and "agree[d] with [New Jersey] that the affirmative act requirement, if not properly applied, may permit Congress to 'accomplish exactly what the commandeering doctrine prohibits' by stopping the states from 'repealing an existing law.'" 730 F.3d at 232 (quoting *Conant v. Walters*, 309 F.3d 629, 646 (9th Cir. 2002) (Kozinski, J., concurring)). *Christie I,* however, discounted concerns regarding PASPA's affirmative act requirement because *Christie I* "d[id] not read PASPA to prohibit New Jersey from repealing its ban on sports wagering." *Id.* According to *Christie I*, PASPA is constitutional because "[n]othing in [PASPA's] words *requires* that the states keep any law in place." *Id.* This conclusion formed the premise for the conclusion in *Christie I* that PASPA passed constitutional muster.

3

Remarkably, the majority chooses to "excise that discussion from our prior opinion as unnecessary dicta." Maj. Op., at 28. This cannot be the case, however, because that discussion was the cornerstone of the holding in *Christie I*. *See In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000) ("Chief Judge Posner has aptly defined dictum as 'a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it.'" (quoting *Sarnoff v. Am. Home Prods. Corp.,* 798 F.2d 1075, 1084 (7th Cir. 1986))).

Indeed, to rationalize its conclusion in *Christie I*, the *Christie I* majority had to expressly reject the notion that when a state "choose[s] to repeal an affirmative prohibition of sports gambling, that is the same as 'authorizing' that activity, and therefore PASPA precludes repealing prohibitions on gambling just as it bars affirmatively licensing it." 730 F.3d at 232. This aspect of *Christie I* was not peripheral to the ultimate holding because *Christie I* specifically "agree[d] with [New Jersey] that the affirmative act requirement, if not properly applied, may permit Congress to 'accomplish exactly what the commandeering doctrine prohibits' by stopping the states from 'repealing an existing law.'" *Id.* (quoting *Conant*, 309 F.3d at 646 (Kozinski, J., concurring)). Thus, to resolve the issue before it, *Christie I* necessarily had to give this issue the "full and careful consideration of the court." *In re McDonald*, 205 F.3d at 612 (quoting *Sarnoff*, 798 F.2d at 1084).

In giving the issue its full and careful consideration, *Christie I* explained that the notion that a "repeal" could be the same as an "authorization" was "problematic in numerous

4

respects." 730 F.3d at 232; *see also id.* ("Most basically, it ignores that PASPA speaks only of 'authorizing *by law*' a sports gambling scheme."). *Christie I* did "not see how having *no law* in place governing sports wagering is the same as authorizing it by law." *Id.* *Christie I* recognized a distinction between affirmative commands for actions and prohibitions, and explained that there was "a false equivalence between repeal and authorization." *Id*. at 233. Thus, as a matter of statutory construction, and to avoid "a series of constitutional problems," *Christie I* specifically held that if the Court did not distinguish between "repeals" (affirmative commands) and "authorizations" (affirmative prohibitions), the Court would "read[] the term 'by law' out of [PASPA]." *Id*. at 233.

I dissented from that opinion because "any distinction between a federal directive that commands states to take affirmative action and one that prohibits states from exercising their sovereignty is illusory." 730 F.3d at 245 (Vanaskie, J., concurring in part and dissenting in part). The decision to base *Christie I* on a distinction between affirmative commands for action and affirmative prohibitions was "untenable," because "affirmative commands to engage in certain conduct can be rephrased as a prohibition against not engaging in that conduct." *Id*. As I explained, basing *Christie I* on such an illusory distinction raises constitutional concerns because "[a]n interpretation of federalism principles that permits congressional negative commands to state governments will eviscerate the constitutional lines drawn" by the Supreme Court. *Id.*

5

**B.**

After *Christie I*, a state like New Jersey *at least* had the choice to either "repeal its sports wagering ban," or, "[o]n the other hand . . . keep a complete ban on sports gambling." *Id.* at 233 (majority opinion). The *Christie I* majority found that this choice was not too coercive because it left "much room for the states to make their own policy" and left it to a State "to decide how much of a law enforcement priority it wants to make of sports gambling, or what the exact contours of the prohibition will be." *Id.*

Today's majority makes it clear that PASPA does not leave a State "much room" at all. Indeed, it is evident that States must leave gambling prohibitions on the books to regulate their citizens. A review of the four Supreme Court anti-commandeering cases referenced by the majority is illuminating.

**1.**

The first two anti-commandeering cases that the majority reviews are *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981), and *F.E.R.C. v. Mississippi*, 456 U.S. 742 (1982). As the majority points out, these cases address "permissible regulation in a pre-emptible field." Maj. Op., at 23. In analyzing these cases, however, the majority overlooks the main rule announced by the Supreme Court in situations where there is an exercise of legislative authority under the Commerce Clause or where Congress preempts an area with federal legislation within its legislative power. In such situations, States have a choice: they may either comply with the federal legislation *or the Federal Government will carry the legislation into effect*.

6

This rule was announced in *Hodel*, where the Supreme Court explained that "[i]f a State does not wish to . . . compl[y] with the Act and implementing regulations, *the full regulatory burden will be borne by the Federal Government*." 452 U.S. at 288 (emphasis added). The same theme repeated itself in *F.E.R.C.*, as the Supreme Court focused on "*the choice put to the States*—that of either abandoning regulation of the field altogether or considering the federal standards." 456 U.S. at 766 (emphasis added). In both cases, the Supreme Court was clear that there must be some choice for the states to make because without it "the accountability of both state and federal officials is diminished." *New York v. United States*, 505 U.S. 144, 168 (1992).

Indeed, in *New York v. United States*, the Court explained that a State's view on legislation "can always be pre-empted under the Supremacy Clause if it is contrary to the national view, but in such a case . . . it will be federal officials that suffer the consequences if the decision turns out to be detrimental or unpopular." *Id.* at 168. The Supreme Court reiterated this point *Printz v. United States*, explaining that, "[b]y forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for 'solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes." 521 U.S. 898, 930 (1997). Thus, States must be given a choice because the Supreme Court is concerned that "it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision." *New York*, 505 U.S. at 169.

7

As the majority explains, while "PASPA's provisions and its reach are controversial (and, some might say, unwise) . . . . we are duty-bound to interpret the text of the law as Congress wrote it." Maj. Op., at 16. Because the majority has excised the distinction between a repeal and an authorization, the majority makes it clear that under PASPA as written, no repeal of any kind will evade the command that no State "shall . . . authorize by law" sports gambling. 28 U.S.C. § 3702. In the face of such a congressional directive, "no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty." *Printz*, 521 U.S. at 935.

**2.**

This leads to the other two anti-commandeering cases reviewed by the majority: *South Carolina v. Baker*, 485 U.S. 505 (1988), and *Reno v. Condon*, 528 U.S. 141 (2000). The majority explains that these cases address permissible "prohibitions on state action." Maj. Op., at 23. Again, however, the majority seems to overlook the animating factor for each of these opinions. In both *Baker* and *Reno* the Supreme Court explained that permissible prohibitions regulated *State activities*. The Supreme Court has never sanctioned statutes or regulations that sought to control or influence *the manner in which States regulate private parties*.

For example, in *Baker*, the Supreme Court reviewed a challenge to the Internal Revenue Code's enactment of § 310(b)(1) of the Tax Equity and Fiscal Responsibility Act of 1982, which prohibited States from issuing unregistered bearer bonds. Notably, when reviewing the case, the Court specifically found that it did not need to address "the

8

possibility that the Tenth Amendment might set some limits on Congress' power to compel States to regulate on behalf of federal interests" because the Court found that the commandeering concerns "in *FERC* [were] inapplicable to § 310." *Baker*, 485 U.S. at 513. Importantly, the Court distinguished § 310 from the statute in *F.E.R.C.* because the Court found that "Section 310 regulates state activities; it does not, as did the statute in *FERC*, seek to control or influence the manner in which States regulate private parties." *Id.* at 514. Similarly, in *Reno*, the Court addressed a statute that did not require (1) "the States in their sovereign capacity to regulate their own citizens," (2) "the . . . Legislature to enact any laws or regulations," or (3) "state officials to assist in the enforcement of federal statutes regulating private individuals." 528 U.S. at 151. It was only on these bases that the Supreme Court found the statute at issue in *Reno* was "consistent with the constitutional principles enunciated in *New York* and *Printz*." *Id.*

Unlike the statutes at issue in *Baker* and *Reno*, however, PASPA seeks to control and influence the *manner* in which States regulate private parties. Through PASPA, Congress unambiguously commands that "[i]t shall be unlawful for . . . a governmental entity to . . . authorize by law" sports gambling. 28 U.S.C. § 3702. By issuing this command, Congress has set an impermissible "mandatory agenda to be considered in all events by state legislative or administrative decisionmakers." *F.E.R.C.*, 456 U.S. at 769.

### 3.

The logical extension of the majority is that PASPA prevents States from passing *any* laws to repeal existing gambling laws. As the majority correctly notes, "[t]he word

9

'authorize' means, inter alia, '[t]o empower; to give a right or authority to act,' or '[t]o permit a thing to be done in the future.'" Maj. Op., at 17 (quoting Black's Law Dictionary 133 (6th Ed. 1990)) (footnote omitted). Because authorization includes permitting a thing to be done, it follows that PASPA also prevents state officials from stopping enforcement of existing gambling laws. States *must* regulate conduct prioritized by Congress. *Cf. Conant*, 309 F.3d at 646 (Kozinski, J., concurring) ("[P]reventing the state from repealing an existing law is no different from forcing it to pass a new one; in either case, the state is being forced to regulate conduct that it prefers to leave unregulated.").

It is true that civil actions to enjoin a violation of PASPA "may be commenced in an appropriate district court of the United States by the Attorney General of the United States." 28 U.S.C. § 3703. But it can hardly be said that the United States Attorney General bears the full regulatory burden because, through PASPA, Congress effectively commands the States to maintain and enforce existing gambling prohibitions.[1]

PASPA is a statute that directs States to maintain gambling laws by dictating the manner in which States must enforce a federal law. The Supreme Court has never considered Congress' legislative power to be so expansive. *See Prigg v. Com. of Pennsylvania*, 41 U.S. 539, 541 (1842) ("It might well be deemed an unconstitutional exercise of the power of interpretation, to insist that the states are bound to

---

[1] A refusal to enforce existing laws would be the same as a repeal of existing laws: the States would be authorizing sports wagering.

provide means to carry into effect the duties of the national government, nowhere delegated or intrusted to them by the constitution"); *F.E.R.C.*, 456 U.S. at 761–62 ("[T]his Court never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations ") (citing *E.P.A. v. Brown*, 431 U.S. 99 (1977)); *New York*, 505 U.S. at 178 ("Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents."); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2602 (2012) (plurality opinion) ("[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." (quoting *New York*, 505 U.S. at 162)).

## II.

It is now apparent that *Christie I* was incorrect in finding that "*nothing* in [PASPA's] words *requires* that the states keep *any* law in place." 730 F.3d at 232 (first and third emphasis added). With respect to the doctrinal anchors of *Christie I*, the cornerstone of its holding has been eroded by the majority, which has excised *Christie I*'s discussion regarding "a false equivalence between repeal and an authorization." *Id.* at 233. Notably, that discussion was included in *Christie I* to avoid "a series of constitutional problems." *Id.* Today's majority makes it clear that passing a law so that there is no law in place governing sports wagering is the same as authorizing it by law. *See* Maj. Op., at 17 ("The word 'authorize' means, inter alia, '[t]o empower; to give a right or authority to act,' or '[t]o permit a thing to be done in the future.'") (citation and footnote omitted).

11

I dissented in *Christie I* because the distinction between repeal and authorization is unworkable. Today's majority opinion validates my position: PASPA leaves the States with no choice. While *Christie I* at least gave the States the option of repealing, in whole or *in part*, existing bans on gambling on sporting events, today's decision tells the States that they must maintain an anti-sports wagering scheme. The anti-commandeering doctrine, essential to protect State sovereignty, prohibits Congress from compelling States to prohibit such private activity. Accordingly, I dissent.